OPINION
{¶ 1} Defendant-appellant Robert Jones, III appeals his conviction and sentence from the Licking County Court of Common Pleas on two counts of possession of heroin, two counts of corrupting another with drugs, and two counts of involuntary manslaughter. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On July 6, 2004, the Licking County Grand Jury indicted appellant on two counts of possession of heroin in violation of R.C. 2925.11(A)(C)(6)(a), felonies of the fifth degree, two counts of corrupting another with drugs in violation of R.C.2925.02(A)(3), felonies of the second degree, two count of involuntary manslaughter in violation of R.C. 2903.04(A), felonies of the first degree, and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. At his arraignment on July 12, 2004, appellant entered a plea of not guilty to the charges contained in the indictment.
 {¶ 3} Subsequently, a jury trial commenced on May 2, 2005. The following testimony was adduced at trial.
 {¶ 4} J. William Stewart Gowans, who was working as a sergeant for the Licking County Sheriff's Department on June 23rd and 24th of 2004,[1] testified that, while working the midnight shift, he received a call regarding an "unresponsive male" at the Shamrock Motel. Transcript at 71. Sergeant Gowans and Deputy Timothy Allen arrived on the scene and found a man in the parking lot who appeared visibly upset and who pointed to a room in the motel. When Sergeant Gowans went into the room, he saw two males. While one was Tim Loring, the other was Mark Jones, appellant's father. Both were deceased. After telling Deputy Allen to talk to the man in the parking lot, Sergeant Gowans began looking for evidence. Deputy Allen informed Sergeant Gowans that there might be a beer bottle containing syringes. When Sergeant Gowans searched the bushes near the motel room, he found a beer bottle. On cross-examination, Sergeant Gowans testified that the bushes were the first place that he looked because he had been advised by Deputy Allen that the beer bottle was located in the bushes.
 {¶ 5} At trial, Deputy Allen testified that when he arrived on the scene, he found appellant walking around the parking lot and talking to Sergeant Gowans. Deputy Allen then took charge of appellant, who was crying, and obtained a written statement from him. When Deputy Allen asked appellant what had happened, appellant "said that him and his father and another gentleman done some heroin and Robert [appellant] passed out. When he woke up, neither one of them was breathing." Transcript at 83. Appellant told Deputy Allen that he had obtained the heroin in Pataskala. Appellant also told the deputy that, after putting the syringes into the beer bottle, he threw the same into the bushes. Deputy Allen conveyed such information to Sergeant Gowans.
 {¶ 6} On cross-examination, Deputy Allen testified, in relevant part, as follows:
 {¶ 7} "Q. Do you recall in the statement Mr. Jones [appellant] indicating that one of the men who was found in his room who had passed away, do you recall him writing that that individual had affirmatively requested that Mr. Jones obtain heroin for him?
 {¶ 8} "A. I do believe that's in the statement, yes, sir.
 {¶ 9} "Q. And you indicated also that — I'm sorry, you also recall Mr. Jones explaining in his written statement that the deal with Mr. Loring was that if he obtained some of this heroin for Mr. Loring, Mr. Loring would be required to share it with both himself as well as his father, Mr. Jones?
 {¶ 10} "A. Yes, sir." Transcript at 89-90.
 {¶ 11} At trial, Dr. Carl Jeffrey Lee, a forensic pathologist and deputy coroner for Licking County, testified that he performed the autopsies on Tim Loring and Mark Jones. Dr. Lee testified that Tim Loring smelled strongly of alcohol and had a needle puncture wound in his left arm. During his examination of Loring, Dr. Lee found fluid in his lungs that was not consistent with infection. Dr. Lee testified that the fluid in Loring's lungs and the swelling in his brain were consistent with a drug overdose. Based on his suspicion of drug activity, Dr. Lee had blood tests performed by a toxicologist. Based on the test results and his own physical findings, Dr. Lee testified to a reasonable degree of scientific certainty that the cause of Loring's death was "drug effects due to heroin." Transcript at 155. The following is an excerpt from Dr. Lee's testimony:
 {¶ 12} "A. Okay, once heroin gets into your body it breaks down into morphine, and everyone has probably heard of morphine. Morphine affects your brain by causing — it slows your heart beat down, it slows your breathing down, and during that slowing period, the fluid collects in your lungs because you're not breathing as effectively as normal. It's similar to one who has — has their chest bound because they've broken some ribs, someone who has congestive heart failure when you don't have effective pumping of the heart and breathing of the lungs, then you have a build-up of fluid in your lungs. That's what morphine does. Eventually the level in the brain and the blood gets higher and higher and higher, it keeps your pumping and your breathing less and less effective until eventually it shuts it completely down.
 {¶ 13} "Q. All right. If I'm understanding correctly, it's a — more or less a system depressant?
 {¶ 14} "A. Yes, because it acts on the brain rather than the lungs directly." Transcript at 155-156.
 {¶ 15} Dr. Lee also testified concerning the autopsy that he performed on Mark Jones. Dr. Lee testified that Jones had several needle puncture marks on his arms and smelled strongly of alcohol. Like Loring, Jones had moderate swelling in the brain and fluid filled lungs. Based on his physical examination of Jones and blood test results that he received from a toxicologist, Dr. Lee testified to a reasonable degree of scientific certainty that Jones died as a result of "drug effects due to heroin." Transcript at 167.
 {¶ 16} On cross-examination, Dr. Lee testified that both Mark Jones and Tim Loring had blood alcohol content levels of .16 at the time of death, which was approximately twice the legal limit. He also testified that he could not conclusively rule out that the two had ingested heroin prior to their deaths "from means other than a needle." Transcript at 180.
 {¶ 17} On redirect examination, the following testimony was adduced when Dr. Lee was asked whether the blood alcohol concentrations alone were likely to have been fatal for either Mark Jones or Tim Loring:
 {¶ 18} "A. No, neither one would have been fatal. The — I think I said before that we don't even consider that a lethal level of alcohol until it gets to .35 and above. Everything else below that is very little, if any, chance of causing a person to die from those lower numbers. . . .
 {¶ 19} "Q. If there is a cumulative effect to alcohol and heroin and this alcohol level would not have been fatal, what would have been, in your opinion, based on a reasonable degree of scientific certainty, what would it have been that caused the death.
 {¶ 20} "A. Well, I think that's the situation we're talking about now, if I understand your question, and that's why I ruled that this was heroin death due to the heroin drug effects. I didn't think the alcohol had a significant enough level or effect to be a major cause of his death." Transcript at 186-187.
 {¶ 21} Dr. Laureen Marinetti, a toxicologist, testified at trial that she performed toxicology reports on both Mark Jones and Tim Loring. Dr. Marinetti testified that test results showed opiates (heroin) and ethanol, which is commonly found in beer and wine, in Mark Jones' blood. Additional testing also found a small amount of benadryl, an over-the-counter antihistamine, in Jones' blood. Dr. Marinetti also testified that she found alcohol, opiates and benadryl in Tim Loring's blood. The amount of benadryl in Loring's blood was "in the therapeutic range, not a toxic range." Transcript at 209. The following testimony was adduced when Dr. Marinetti was asked about the cause of death for both Jones and Loring:
 {¶ 22} "A. My opinion as far as the cause of death on both of these individuals would be termed multiple drug intoxication, and that is because alcohol is a central nervous system and respiratory depressant. Morphine is the same thing, respiratory depressant, central nervous depressant, and diphenhydramine is also a depressant. The combination of three like drugs has an additive effect. Perhaps the drugs alone wouldn't have been a problem, but when they're combined this way, you get into trouble." Transcript at 209-210.
 {¶ 23} Dr. Marinetti further testified that neither the alcohol or benadryl alone would have caused the two deaths and that she believed that both men would have survived a .16 blood level with the benadryl levels that they had. When asked whether she could say to a reasonable degree of scientific certainty whether it was the heroin that actually "put them over the edge, that caused the fatalities here", Dr. Marinetti responded that she believed that it was. Transcript at 213.
 {¶ 24} At trial, appellant took the stand in his own defense and testified that on June 24, 2004, he was living at the Shamrock Motel with his father, Mark Jones. Appellant further testified that, on June 23, 2004, he drove to Pataskala to pick up heroin with an individual named "Tom" and that he and Tom "did about a half a bag each." Transcript at 279. Appellant purchased the heroin from a woman he knew named Lisa.
 {¶ 25} Appellant testified that he later made arrangements to trade a CD player that he had just sold to Tim Loring for heroin and that Loring agreed to such arrangement. After appellant and Tim Loring[2] picked up the heroin in Pataskala from Lisa, they went back to the motel and appellant divided the heroin into three equal doses using clean needles. Appellant then put one dose into each needle and handed one to his father and one to Tim Loring. After Tim Loring shot up, he gave his belt to Mark Jones. Appellant testified that he did not physically inject the drugs into either Tim Loring or Mark Jones, but that they injected themselves. However, appellant admitted that, after his father had trouble finding a vein, appellant stuck the needle into him. Appellant then put the syringes into a beer bottle.
 {¶ 26} Appellant lost consciousness. After coming to, appellant was unable to rouse his father and called 911. While on the phone with 911, appellant threw the beer bottle into bushes outside of his room. When the officers arrived, appellant told Deputy Allen where to find the beer bottle.
 {¶ 27} At the conclusion of the evidence and the end of deliberations, the jury, on May 4, 2005, found appellant guilty of two counts each of possession of heroin, corrupting another with drugs, and of involuntary manslaughter and not guilty of the offense of tampering with evidence. Pursuant to a Judgment Entry filed on May 27, 2005, appellant was sentenced to an aggregate prison sentence of twelve (12) years.
 {¶ 28} Appellant now raises the following assignments of error on appeal:
 {¶ 29} "I. THE TRIAL COURT ERRED WHEN IT REFUSED TO GRANT A JURY INSTRUCTION ON THE AFFIRMATIVE DEFENSE OF CONSENT.
 {¶ 30} "II. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I {¶ 31} Appellant, in his first assignment of error, argues that the trial court erred in failing to give a jury instruction on the affirmative defense of consent. We disagree.
 {¶ 32} In the case sub judice, appellant, on May 3, 2005, filed his proposed jury instructions requesting that the following instruction be given to the jury:
 {¶ 33} "1. Mr. Jones has claimed the defense of consent, claiming that Timothy Loring and Marc Jones consented to the possibility of sustaining serious physical harm or death from their voluntary use of heroin. When a person who has been harmed as a result of the actions of another has given consent to the harm committed, the other person is entitled to be acquitted of an offense containing an element of causing serious physical harm."
 {¶ 34} However, the trial court declined to give such an instruction. After the jury retired for deliberations, a discussion was had on the record about appellant's request for an instruction on consent. The trial court, at the conclusion of such discussion, stated on the record as follows:
 {¶ 35} "THE COURT: The Court would indicate on the record that the Court determined that consent is not an affirmative defense in this matter. Consent is really not a matter — wasn't an element involved in this; therefore it would have been inappropriate to instruct the jury that consent was a defense, and the Court, again, feels that the law would indicate that consent is not an affirmative defense in a case of this type and did not give the instruction." Transcript at 377.
 {¶ 36} An "affirmative defense" is defined as "(1) [a] defense expressly designated as affirmative" or "(2)[a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence." R.C. 2901.05(C).
 {¶ 37} Appellant, in the case sub judice, was indicted on two counts of corrupting another with drugs in violation of R.C.2925.02(A)(3). Such section states, in relevant part, as follows: "(A) No person shall knowingly do any of the following: . . . (3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."
 {¶ 38} R.C. 2925.02, the corrupting another with drugs statute, does not designate consent as an affirmative defense. Moreover, upon our review of the case law, we are unable to find any authority for the proposition that consent is an affirmative defense to the charge of corrupting another with drugs. Appellant himself admits that there are no cases on point.
 {¶ 39} Based on the foregoing, we find that the trial court did not err in failing to give a jury instruction on the affirmative defense of consent.
 {¶ 40} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 41} Appellant, in his second assignment of error, argues that his convictions for involuntary manslaughter and corrupting another with drugs are against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 42} In State v. Jenks (1981), 61 Ohio St.3d 259,574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 43} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment. State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin
(1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 44} Appellant, in the case sub judice, was convicted of corrupting another with drugs in violation of R.C. 2925.02(A)(3) and involuntary manslaughter in violation of R.C. 2903.04(A).
 {¶ 45} R.C. 2925.02 states, in relevant part, as follows: "(A) No person shall knowingly do any of the following: . . . (3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent." In turn, R.C. 2903.04 states, in relevant part, as follows: "(A) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."
 {¶ 46} With respect to the corrupting another with drugs charge, we note that appellant testified that he purchased the heroin from a woman he knew named Lisa and that Tim Loring could not have gone to Lisa's on his own to purchase drugs. In addition, evidence was adduced that appellant purchased the heroin with the understanding that Loring would share it with both appellant and appellant's father. We further note that appellant admitted that he prepared the heroin for use and then divided the same into three equal doses. Appellant also testified at trial, that after loading the syringes, he handed one to Tim Loring and another to his father. Appellant also helped his father find a vein and then stuck the needle into his father's arm. Both Tim Loring and Mark Jones died as a result of heroin use. Based on the foregoing, we find that any rational trier of fact, construing the evidence in a light favorable to the prosecution, could have found that appellant knowingly administered or furnished to another or induced or caused another to use a controlled substance (heroin) and thereby caused serious physical harm to such person.
 {¶ 47} With respect to the involuntary manslaughter charge, appellant specifically argues that there was insufficient evidence that either Mark Jones or Tim Loring died solely as a proximate cause of ingesting heroin. Appellant notes that, at the time of their death, both Tim Loring and Mark Jones had alcohol and benadryl in their systems. We disagree.
 {¶ 48} As is set forth in detail above, Dr. Lee, who conducted the autopsies, testified that both men died of a drug overdose and that the amount of alcohol in their blood was not a significant enough factor to be a cause of death. In addition, Dr. Marinetti testified that she believed that both men would have survived with .16 blood alcohol levels and with the levels of benadryl that they had, but that heroin "put them over the edge" and caused their deaths. Transcript at 213. Dr. Marinetti concluded that the heroin caused both their deaths. As noted by appellee, there was testimony adduced at trial that the heroin overwhelmed the systems of both men and led to their deaths.
 {¶ 49} In short, upon our review of the record, we find that any rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that appellant caused the death of another as a proximate result of committing a felony[3] and that appellant knowingly administered or furnished to another or induced or caused another to use a controlled substance (heroin), and thereby caused serious physical harm to the other person. We further find, upon our review of the record, that the trier of fact clearly did not lose its way and create such a manifest miscarriage of justice that the judgment must be reversed.
 {¶ 50} Appellant's second assignment of error is, therefore, overruled.
 {¶ 51} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.
Edwards, J., Hoffman, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Gowans was retired at the time of the trial.
[2] Loring waited in the car while appellant obtained the drugs from Lisa. Appellant testified that Loring could not have gone over to Lisa's on his own to purchase drugs.
[3] The felony, as set forth in the indictment, was corrupting another with drugs.