[Cite as *State v. Patterson*, 2015-Ohio-4423.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | : | **O P I N I O N** |
| Plaintiff-Appellee/ Cross-Appellant, | : | |
| | : | **CASE NO. 2013-T-0062** |
| - vs - | : | |
| JAMES LAMAR PATTERSON, | : | |
| Defendant-Appellant/ Cross-Appellee. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 12 CR 519.

Judgment: Affirmed in part, reversed in part, and remanded.

*Dennis Watkins,* Trumbull County Prosecutor, and *LuWayne Annos,* Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee/Cross-Appellant).

*Louis M. DeFabio,* 4822 Market Street, Suite 220, Youngstown, OH 44512 (For Defendant-Appellant/Cross-Appellee).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant/cross-appellee, James Lamar Patterson (aka "Fresh"), appeals his convictions and sentencing for various counts of Reckless Homicide, Corrupting Another with Drugs, Trafficking in Heroin, and Tampering with Evidence. Plaintiff-appellee/cross-appellant, the State of Ohio, cross-appeals the lower

court's decision to merge certain Trafficking counts at the time of sentencing. Patterson received an aggregate prison sentence of twenty years. The issues before this court are whether the alleged failure to conduct a formal arraignment on a superseding indictment requires the dismissal of the charges; whether it is error not to sever charges for trial where the charges are based on separate drug transactions; whether Drug Trafficking, Corrupting Another with Drugs, and Reckless Homicide are allied offenses where the sale of heroin to a juvenile results in her death; whether convictions for Involuntary Manslaughter, Reckless Homicide, and Corrupting Another with Drugs are supported by sufficient/the manifest weight of the evidence, based on testimony that the defendant sold drugs which a third person administered to the victim resulting in the victim's death; whether a trial court may increase a particular sentence in order to maintain the length of the aggregate sentence after merger; and whether separate counts of Trafficking may be supported where the defendant has sold a portion of heroin but retained another portion for subsequent sale. For the following reasons, we affirm Patterson's convictions and sentence, except with respect to Trafficking in Heroin (Counts 5 and 6) which the trial court erroneously merged. The case is remanded for further proceedings consistent with this opinion.

{¶2} On September 5, 2012, the Trumbull County Grand Jury issued an Indictment, charging Patterson with the following: Involuntary Manslaughter (Count 1), a felony of the first degree in violation of R.C. 2903.04(A) and (C); Corrupting Another with Drugs (Count 2), a felony of the second degree in violation of R.C. 2925.02(A)(3) and (C)(1); Corrupting Another with Drugs (Count 3), a felony of the second degree in violation of R.C. 2925.02(A)(4) and (C)(1); Trafficking in Heroin (Count 4), a felony of

2

the fourth degree in violation of R.C. 2925.03(A)(1) and (C)(6)(b); Trafficking in Heroin with a Specification of Forfeiture (Count 5), a felony of the third degree in violation of R.C. 2925.03(A)(1) and (C)(6)(c), 2941.1417(A), 2981.02(A)(2) and/or (3)(a), and 2981.04; Trafficking in Heroin with a Specification of Forfeiture (Count 6), a felony of the first degree in violation of R.C. 2925.03(A)(2) and (C)(6)(e), 2941.1417(A), 2981.02(A)(2) and/or (3)(a), and 2981.04; Possession of Cocaine with a Specification of Forfeiture (Count 7), a felony of the fifth degree in violation of R.C. 2925.11(A) and (C)(4)(a), 2941.1417(A), 2981.02(A)(2) and/or (3)(a), and 2981.04; and Tampering with Evidence (Count 8), a felony of the third degree in violation of R.C. 2921.12(A)(1) and (B).

{¶3} Counts 1 through 4 of the Indictment alleged that, on April 6, 2012, Patterson sold heroin in Girard, Ohio, and that the heroin was ultimately used by a seventeen-year-old girl named Christine Sheesley who died as a result of her ingestion of the heroin. Counts 5 through 8 of the Indictment alleged that, on May 24, 2012, Patterson made a drug sale to a police informant during a controlled buy in Girard, Ohio, and that Patterson possessed various drugs and attempted to hide or conceal those drugs during his arrest.

{¶4} On October 29, 2012, Patterson was arraigned and entered a plea of Not Guilty.

{¶5} On January 15, 2013, the Trumbull County Grand Jury issued a Superseding Indictment. The Superseding Indictment was identical to the original Indictment except in the following respects: The Specification of Forfeiture in Counts 5, 6, and 7 of the original Indictment identified the subject property as "a vehicle." In the

Superseding Indictment, the subject property was identified as "a vehicle, one 1999 Ford Expedition, VIN 1FMPU18L9XLA53467." Additionally, the Superseding Indictment added the following language to Count 6 (Trafficking in Heroin) of the original Indictment: "and the amount of the drug involved equals or exceeds ten grams but is less than fifty grams of Heroin, and the offense was committed in the vicinity of a juvenile, date of birth 04/22/95, * * *."

**{¶6}** On January 29, 2013, the trial court's docket noted that an arraignment/pre-trial hearing was scheduled for February 14, 2013.

**{¶7}** On February 14, 2013, the trial court's docket noted: "set final pre trial[,] waiver of speedy trial for an additional 30 days and sets a trial date for [5]/13/13."

**{¶8}** On May 10, 2013, Patterson filed a Motion to Sever Charges, seeking to have Counts 1 through 4 tried separately from Counts 5 through 8.

**{¶9}** On May 13, 2013, Patterson filed a Motion to Dismiss, on the grounds that he "was never arraigned on the superseding indictment."

**{¶10}** A jury trial on the charges against Patterson commenced on May 13, and concluded on May 15, 2013. At the beginning of trial, the trial court denied Patterson's Motions to Sever Charges and to Dismiss. The following witnesses testified on behalf of the State:

**{¶11}** Judy Sheesley testified that she was the mother of Christine Sheesley, born on April 6, 1995. On April 6, 2012, Judy Sheesley had dinner with her daughter to celebrate her birthday. Christine Sheesley received a gift of sixty dollars in cash.

**{¶12}** Captain John Norman of the Girard Police Department testified that, on the morning of April 7, 2012, he responded to a dispatch regarding an unresponsive

4

female in an apartment at 502 Park Avenue in Girard, Ohio. At the scene, Norman discovered Sheesley's lifeless body, Tyler Stevens (who called the police), and Alexis (Lexi) Hugel. After Sheesley's body was removed, Norman questioned Stevens and Hugel at the police station. Stevens and Hugel were interviewed several times and initially gave conflicting accounts of events. As a result of the interview, Norman began a search for a person known as Fresh, later identified as James Patterson.

{¶13} Steve Perch, the toxicologist for the Summit County Medical Examiner's Office, analyzed samples of Sheesley's blood and urine. In Sheesley's blood Perch found morphine present in an amount less than the reportable level of 25 nanograms per milliliter. In Sheesley's urine Perch noted the presence of morphine and 6-monoacetylmorphine.

{¶14} Perch explained that morphine (diacetylmorphine) in the blood metabolizes in less than ten minutes into a compound known as 6-monoacetylmorphine. Within fifteen to twenty minutes, the 6-monoacetylmorphine breaks down into morphine. Within a few hours, all trace of heroin may be eliminated from a person's blood. A similar process of metabolization occurs in urine, but at a slower rate. The primary metabolite, 6-monoacetylmorphine, is peculiar to heroin and would not be present if Sheesley had ingested morphine sulfate or other forms of morphine.

{¶15} Perch was unable to offer an opinion as to when Sheesley ingested heroin or how much she ingested, but testified to a reasonable degree of scientific certainty that she had ingested heroin.

5

{¶16} Dr. Humphrey Donald Germaniuk, the coroner and medical examiner for Trumbull County, conducted an autopsy on Sheesley and determined her cause of death to be "acute heroin intoxication combined with acute pulmonary pneumonia." Dr. Germaniuk noted the presence of moderate edema/congestion in the lungs and mild cerebral edema, both of which are consistent with the ingestion of a lethal amount of heroin. Dr. Germaniuk also explained that the sudden onset of pneumonia occurs from the depression of the respiratory system, an effect of heroin ingestion, which allows secretions to enter the lungs. The source of the secretions was unidentified, but they may have come from Sheesley's own bodily fluids (saliva, mucus, et cetera) or an external source, such as water being poured on her face.

{¶17} Alexis Hugel, seventeen-years-old at the time and a friend of Sheesley's, accompanied her on the evening of April 6, 2012. After having dinner with Sheesley's family, they went to Tyler Stevens' apartment in the early evening. Sheesley had decided to do heroin that night. After a phone call from Stevens, Fresh/Patterson arrived at the apartment. Patterson remained by the door while "Christine got out money and handed it to Tyler and Tyler handed it to Fresh." In return, "Fresh gave Tyler something." During the transaction, neither Sheesley nor Hugel spoke with Patterson. After about fifteen minutes, Patterson departed.

{¶18} Hugel left the apartment before Stevens and Sheesley ingested the heroin. When she returned, Sheesley was "passed out" and "slumped down over [a recliner] chair" in the front room. Stevens was "nervous" and "moving around a lot." Sheesley was moved to the bedroom where they tried to awaken her. Sheesley was making "gurgling noises" and a sound like "muffled" crying. Around midnight, Patterson

returned to the apartment. "He said that she needed rest, and that if she didn't wake up to put her in a cold shower." Patterson remained about a half of an hour in the apartment before departing again. Hugel fell asleep. While she slept, Stevens dragged Sheesley back into the front room.

{¶19} When Hugel was first interviewed by the police, she did not mention that heroin was involved to avoid getting in trouble.

{¶20} Tyler Stevens, eighteen-years-old at the time, lived at the Park Avenue apartment with his father. Stevens had known Patterson for about three years. On April 6, 2012, Stevens arranged to buy fifty dollars worth of heroin from Patterson for Sheesley. Stevens called Patterson after Sheesley and Hugel arrived at his apartment. Patterson "walked in the door" and "started talking for a minute." Sheesley remained seated near the door. According to Stevens: Patterson "goes to hand me the heroin, I said, 'No, Christine, she has the money. Hand it to her.'" Patterson set the heroin down on a table and Sheesley handed him a fifty dollar bill.

{¶21} After Patterson and Hugel departed, Stevens injected himself with heroin, and then Sheesley. Stevens passed out. When he awoke, he found Sheesley passed out in the recliner. Later, after Hugel came back, Stevens became concerned and tried to awaken Sheesley. He "put water on her," "shook her," and "smacked her a few times." Stevens called Patterson and asked him "to come back to smoke a blunt." Patterson "looked at her and said she would be all right."

{¶22} The following morning, Stevens called the police. At the time, he believed Sheesley was still alive because he heard "the rattles."

**{¶23}** Stevens admitted that he lied to the police about using heroin during his initial interview. Stevens also threw away the phone he had used to call Patterson in Mill Creek Park and had his father dispose of the needle he used to inject Sheesley.

**{¶24}** As a result of Sheesley's death, Stevens pled guilty to Involuntary Manslaughter, Corrupting Another with Drugs, Trafficking in Heroin, and Permitting Drug Abuse. In exchange for his testimony against Patterson, the State agreed to recommend a five-year prison sentence for all charges.

**{¶25}** Officer John Freeman of the Girard Police Department testified that he was made aware of Patterson by Captain Norman. Freeman arranged for a confidential informant, named Theodore Thomas aka Riggs, to set up a controlled buy of heroin from Patterson.

**{¶26}** The controlled buy occurred on May 24, 2012, at JP's Car Wash located at 605 Trumbull Avenue, in Girard. Freeman observed a blue Ford Expedition enter one of the wash bays and Thomas approach the vehicle. At this point, police officers moved on the car wash to effect an arrest. There were three persons in the vehicle: Patterson in the driver's seat; Aaron Profanchik in the passenger's seat; and Keairra Price in the rear seat. Patterson did not comply with Freeman's command to show his hands. Instead, he "was making a lot of furtive movements" and "appeared that he was either grabbing for something or attempting to conceal something around his person." Freeman recovered two bags of heroin from the vehicle and two-hundred and seventy-four dollars in cash from Patterson.

**{¶27}** Aaron Profanchik was a passenger in Patterson's vehicle at the time of arrest. At the car wash, Profanchik observed a "white dude" handing Patterson money.

8

Next, Profanchik heard Patterson say, "the police is on us," looked up, and saw the police approaching with guns drawn and ordering Patterson to "freeze." Patterson screamed, "here, Moochie" (Price's nickname), and began taking things from his pants and throwing them into the back seat. A police officer then tasered Patterson.

{¶28} Keairra Price is Profanchik's girlfriend and was seventeen-years-old at the time of the controlled buy. She observed the white man approach and give Patterson money. When the police appeared, Patterson "threw stuff in the back seat," which Price picked up and put inside her pants. Price surrendered "the stuff" to the police after being removed from the vehicle.

{¶29} Theodore Thomas is a "professional confidential informant" for the Girard Police Department. At Officer Freeman's request, he arranged to buy about two-hundred and forty dollars worth of heroin from Patterson. At the car wash, he gave Patterson the money and received heroin in a "plastic baggie" with "the corner tied up." At the approach of the police, Thomas ran from the wash bay.

{¶30} Detective Greg Manente works for the Girard Police Department and is assigned to the Northern Ohio United States Marshalls Task Force. Manente testified that a typical street buy of heroin involves less than a gram, which is worth "roughly" one-hundred and forty to one-hundred and sixty dollars. For an individual to be in possession of ten or more grams of heroin is an indication that the individual is trafficking.

{¶31} Manente observed the controlled buy on May 24, 2012: "The driver looked at me and immediately turned into the back seat with his hands out of my view."

9

Manente tasered the driver of the vehicle and recovered narcotics from the female in the back seat.

{¶32} Shervone Bufford, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, analyzed the narcotics seized during the controlled buy. She identified the substance recovered from Thomas as 0.5 grams of heroin, the substances recovered from the vehicle as 1.1 grams of heroin and 2.7 grams of cocaine, and the substance recovered from Price as 10.1 grams of heroin.

{¶33} Detective Scott Strain, a juvenile detective and school resource officer with the Girard Police Department, conducted interviews with Stevens and Hugel and participated in the controlled buy resulting in Patterson's arrest.

{¶34} At the close of the State's case, Patterson moved for acquittal pursuant to Criminal Rule 29(A). The court denied the motion. Thereafter, Patterson successfully motioned the court to include a jury instruction on Reckless Homicide as a lesser included offense of Involuntary Manslaughter.

{¶35} On May 16, 2013, the jury returned the following verdicts: not guilty of Involuntary Manslaughter (Count 1), but guilty of the lesser included offense of Reckless Homicide, a felony of the third degree in violation of R.C. 2903.041(A) and (B); guilty of Corrupting Another with Drugs (Count 2); guilty of Corrupting Another with Drugs (Count 3); guilty of Trafficking in Heroin (Count 4); guilty of Trafficking in Heroin (Count 5); guilty of Trafficking in Heroin (Count 6); not guilty of Possession of Cocaine (Count 7); and guilty of Tampering with Evidence (Count 8). On motion of the State, the Specifications of Forfeiture were dismissed.

**{¶36}** On May 23, 2013, a sentencing hearing was held. Before imposing sentence, the trial court merged Counts 2 and 3 (Corrupting Another with Drugs), with the State electing to proceed on Count 3, and Counts 5 and 6 (Trafficking in Heroin), with the State electing to proceed on Count 6. The court ordered Patterson to serve a prison sentence of thirty-six months on Count 1 (Reckless Homicide), seven years mandatory on Count 3 consecutive to Count 1, eighteen months on Count 4 (Trafficking in Heroin) to run concurrent with Count 1, seven years mandatory on Count 6 to run consecutive to Count 3, and thirty-six months on Count 8 (Tampering with Evidence) to run consecutive to Count 6, for an aggregate prison term of twenty years, of which fourteen years are mandatory. The court further ordered Patterson to pay a mandatory fine of $15,000 with respect to Count 3, suspended his driver's license for a period of five years, and advised him of post-release control.

**{¶37}** On May 31, 2013, the trial court issued its written Entry on Sentence, which failed to include the prison sentence for Count 4.

**{¶38}** On June 7, 2013, Patterson filed his Notice of Appeal.

**{¶39}** On June 17, 2013, the State filed its Notice of Cross-Appeal.

**{¶40}** On August 23, 2013, the trial court issued a *Nunc pro Tunc* Entry on Sentence, including the prison sentence for Count 4.

**{¶41}** On appeal, Patterson raises the following assignments of error:

**{¶42}** "[1.] The trial court failed to formally arraign the Appellant on the Super[s]eding Indictment and Appellant raised this issue prior to trial pursuant to a *Motion To Dismiss*, however, that motion was denied by the trial court. The trial court

11

erred in overruling said motion and, therefore, Appellant's convictions must be reversed."

{¶43} "[2.] The trial court erred in refusing to sever Counts 1 through 4 from Counts 5 through 8 for trial. The two (2) sets of crimes occurred on two (2) separate dates. The evidence relating to each charge was not simple and direct and evidence relating to one (1) set of charges would not have been admissible, as "Other Acts" evidence, at the trial of the second set of charges."

{¶44} "[3.] With respect to Counts 1 through 4, the Appellant committed a single act, with a single state of mind and, therefore, the offenses were committed by the same conduct. As such, the offenses were allied offenses of similar import and should have merged for purposes of sentencing. The trial court erred in refusing to merge the sentences for said offenses."

{¶45} "[4.] The trial court erred in overruling the Appellant's Crim.R. 29 motion as to the Involuntary Manslaughter charge (Count 1) and the Corrupting Another With Drugs charges (Counts 2 and 3) as there was insufficient evidence to allow the charges to be presented to the jury. Further, the jury's verdicts of Guilty as to Counts 2 and 3 [and] the lesser included offense of Reckless Homicide was not supported by sufficient evidence and was against the manifest weight of the evidence."

{¶46} "[5.] The trial court erred and abused its discretion by increasing the Appellant's sentence on Count 8 from two (2) years to three (3) years at the conclusion of the sentencing hearing."

{¶47} The State raises the following assignment of error on cross-appeal:

12

{¶48} "[1.] The trial court erred in merging Counts 5 and 6 for sentencing purposes when they are not allied offenses of similar import."

{¶49} In Patterson's first assignment of error, he contends that the charges against him in the Superseding Indictment should have been dismissed as he was never formally arraigned on those charges.

{¶50} The arraignment of a defendant "shall be conducted in open court, and shall consist of reading the indictment, information or complaint to the defendant, or stating to the defendant the substance of the charge, and calling on the defendant to plead thereto." Crim.R. 10(A). "When a defendant not represented by counsel is brought before a court and called upon to plead, the judge or magistrate shall cause the defendant to be informed and shall determine that the defendant understands," inter alia, that he "has a right to retain counsel even if the defendant intends to plead guilty, and has a right to a reasonable continuance in the proceedings to secure counsel," and that he "has a right to counsel, and the right to a reasonable continuance in the proceeding to secure counsel, and, * * * the right to have counsel assigned without cost if the defendant is unable to employ counsel." Crim.R. 10(C)(1) and (2).

{¶51} "In Ohio, the general rule is that arraignment under the criminal rules is not necessary when the defendant knows what he or she is accused of and is able to adequately defend himself or herself." *Lewis v. Akron Mun. Court*, N.D.Ohio No. 05: 09 CV 1418, 2011 U.S. Dist. LEXIS 55447, 11 (May 4, 2011), citing *Hamilton v. Brown*, 1 Ohio App.3d 165, 167, 440 N.E.2d 554 (12th Dist.1981). "Vacating convictions for lack of formal arraignment proceedings is predicated on the existence of possible prejudice. * * * The interests presumptively at issue are the right to know of the charges and the

13

right to adequately prepare a defense, rights which might be prejudiced by the lack of formal charge and entry of plea until the beginning of trial proceedings." (Citation omitted.) *Brown* at 167; *State v. Gates*, 11th Dist. Portage No. 2011-P-0001, 2011-Ohio-5711, ¶ 8 (the purpose of the arraignment is "to advise the accused of his constitutional rights and to inform him of the nature of the charge against him") (citation omitted).

{¶52} Patterson claims he "was prejudiced due to the failure to inform him of his rights to counsel * * *[;] had the Appellant been advised of his rights to counsel at his arraignment (which would have been several months prior to trial), he would have understood, then, that he had a right to seek other counsel or, if he could not afford other counsel, that he could seek appointed counsel." Appellant's brief at 9-10.

{¶53} Assuming, arguendo, that Patterson was not formally arraigned on the Superseding Indictment,[1] we find no prejudice. The record before this court demonstrates that Patterson was both aware of and exercising his right to counsel irrespective of arraignment under the Superseding Indictment. On October 29, 2012, Patterson was formally arraigned under the original Indictment, which was substantially similar to the Superseding Indictment. As a result of the prior arraignment, Patterson would have been aware of the nature of the charges against him and his constitutional rights. Subsequent to the original arraignment, Patterson retained counsel who represented him at the February 14, 2013 arraignment/pre-trial. On this date, Patterson

---

1. The trial court scheduled Patterson for arraignment/pre-trial on the Superseding Indictment on February 14, 2013. A pre-trial was held on that date, at which Patterson waived his right to a speedy trial, but the court's docket does not indicate whether there was a reading of the Indictment in open court. On November 20, 2013, during the course of the appeal, counsel for Patterson advised this court that a transcript of the February 14, 2013 arraignment/pre-trial had been requested, but not prepared.

14

executed a Waiver of Speedy Trial rights, which document was signed by both Patterson and his counsel. As Patterson had legal representation at this time, the trial court was not required under the Criminal Rules to advise him of his Sixth Amendment rights. Crim.R. 10(C). Patterson's subsequent dissatisfaction with trial counsel was in no way connected with the failure to formally arraign him under the Superseding Indictment. In the absence of any colorable claim of prejudice arising from the arraignment procedure in this case, Patterson's argument must be rejected.

**{¶54}** The first assignment of error is without merit.

**{¶55}** Under the second assignment of error, Patterson argues that the trial court erred by denying his Motion to Sever Charges.[2]

**{¶56}** "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A).

**{¶57}** In the present case, the two sets of charges, Counts 1 through 4 and Counts 5 through 8, are of a similar character (both being drug transactions) and are connected inasmuch as the controlled buy arose out of the investigation of Sheesley's death.

---

2. Patterson's Motion to Sever Charges was untimely filed on May 10, 2013, three days before trial commenced. Crim.R. 12(D) ("[a]ll pretrial motions * * * shall be made within thirty-five days after arraignment or seven days before trial, whichever is earlier"); Crim.R. 12(C)(5) ("[t]he following must be raised before trial * * * [r]equests for severance of charges or defendants under Crim. R. 14"). The failure to file a timely motion for severance is sufficient reason for its denial. *State v. Bell*, 3rd Dist. Seneca No. 13-12-39, 2013-Ohio-1299, ¶ 29.

**{¶58}** "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires." Crim.R. 14.

**{¶59}** "To prevail on his claim that the trial court erred in denying his motion to sever, the defendant has the burden of demonstrating three facts. He must affirmatively demonstrate (1) that his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial." *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992); *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus.

**{¶60}** "When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed, and (2) if not, whether the evidence of each crime is simple and distinct." *Id.* "Thus, when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)." *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).

**{¶61}** Patterson claims that the joinder in the present case was prejudicial in that the events of the May 24, 2012 controlled buy constituted "other acts" evidence which tended "to show that Appellant was a drug trafficker and should be convicted in the sale

16

of drugs to Mr. Stevens and the death of Ms. Sheesley on that basis alone." Patterson further claims the testimony regarding the controlled buy bolstered Stevens' and Hugel's credibility which "was significantly called into question given their conflicting testimony and their inconsistent and untruthful prior statements." Appellant's brief at 14-15.

**{¶62}** We find no prejudice resulting from the joinder of charges in the present case and that the evidence of each crime was simple and direct. Patterson's involvement in the controlled buy was firmly established by the testimony of police officers and the passengers in Patterson's vehicle. His involvement in Sheesley's death was established by the testimony of Stevens and Hugel. With respect to Stevens' testimony, there was no possibility of misidentification. Stevens testified that he had known Patterson for several years and deliberately contacted him to obtain heroin on Sheesley's behalf. If Stevens' identification were to be discredited, the jury would have to conclude that he intentionally lied about the source of the heroin. The corroboration of Stevens' testimony by Hugel's identification was much more significant than Patterson's subsequent involvement in the controlled buy. Hugel, unlike Stevens, was not charged in connection with Sheesley's death and so received no consideration for her testimony. Hugel did not use heroin and did not like Stevens. She observed Patterson on two occasions during the night of April 6, during the course of which she spoke with him and he introduced himself as "Fresh." Patterson's involvement in the controlled buy had little corroborative value as to whether Stevens was intentionally lying to implicate Patterson in Sheesley's death. *Torres*, 66 Ohio St.2d at 344, 421 N.E.2d 1288 (joinder was not improper where the evidence "was amply sufficient to sustain each verdict, whether or not the indictments were tried together").

17

{¶63} Moreover, the testimony regarding the events of April 6, 2012, and May 24, 2012, was simple and direct. The two incidents involved different witnesses, occurred at different locations, and were separated in time by over a month and a half. Courts have regularly held that joinder in such circumstances is not improper, even when the different sets of charges are drug related. *State v. Harris*, 8th Dist. Cuyahoga Nos. 98183 and 98184, 2013-Ohio-484, ¶ 11 ("the jury could reasonably separate the evidence as to each charge" where "the offenses in each case pertained to drug-related activity in the appellant's home, at which the police executed search warrants on two separate occasions"); *State v. Cassell*, 10th Dist. Franklin Nos. 08AP-1093 and 08AP-1094, 2010-Ohio-1881, ¶ 59 ("[a]lthough both incidents involved Jones and appellant, the incidents took place six months apart, at separate locations"); *State v. Wilkins*, 12th Dist. Clinton No. CA2007-03-007, 2008-Ohio-2739, ¶ 16 (rejecting the argument that "the cumulatory effect of evidence made it more likely that a jury would find * * * [the appellant] was guilty of the more serious crimes, though those crimes are based allegedly on ambiguous evidence," where the evidence supporting various trafficking convictions was simple, direct, and legally sufficient).

{¶64} The second assignment of error is without merit.

{¶65} In the third assignment of error, Patterson contends the trial court erred by not merging Counts 1 through 4 as allied offenses of similar import.

{¶66} Ohio's multiple counts statute or allied offenses of similar import statute provides:

> (A)    Where the same conduct by defendant can be construed to
>
> constitute two or more allied offenses of similar import, the

18

indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25; *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph three of the syllabus ("a defendant whose conduct supports multiple offenses may be convicted of all the offenses if any one of the following is true: (1) the conduct constitutes offenses of dissimilar import, (2) the conduct shows that the offenses were committed separately, or (3) the conduct shows that the offenses were committed with separate animus").

{¶67} "In determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must evaluate three separate factors—the conduct, the animus, and the import." *Id.* at paragraph one of the syllabus. "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶68} The Ohio Supreme Court has recognized that an allied offenses inquiry "must focus on the defendant's conduct to determine whether one or more of the

19

convictions may result because an offense may be committed in a variety of ways and the offenses committed may have different import." *Id.* at ¶ 30. The Supreme Court rejected a "bright-line rule" applicable in every situation: "this analysis may be sometimes difficult to perform and may result in varying results for the same set of offenses in different cases," which results "are permissible, given that the statute instructs courts to examine a defendant's conduct—an inherently subjective determination." *Id.* at ¶ 32, citing *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 52 (plurality opinion per Brown, C.J.).

**{¶69}** The trial court is not required to merge the offenses until after the jury has returned its verdicts. "Allied offenses of similar import do not merge until sentencing, since a conviction consists of verdict and sentence." *State v. McGuire*, 80 Ohio St.3d 390, 399, 686 N.E.2d 1112 (1997); *Johnson* at ¶ 47 ("[u]nder R.C. 2941.25, the court must determine prior to sentencing whether the offenses were committed by the same conduct").

**{¶70}** "An appellate court should apply a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

**{¶71}** In the present case, the trial court merged Counts 2 and 3, Corrupting Another with Drugs, and the State elected to proceed on Count 3. Accordingly, we will begin our analysis by comparing Corrupting Another with Drugs with Count 4, Trafficking in Heroin, as charged in the Superseding Indictment. To commit Corrupting Another with Drugs, the offender must "[f]urnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the

20

age of the juvenile or is reckless in that regard." R.C. 2925.02(A)(4)(a). To commit Trafficking in Heroin, the offender must "[s]ell or offer to sell a controlled substance * * * in the vicinity of a juvenile." R.C. 2925.03(A)(1) and (C)(6)(b). Under the facts of this case, the offenses of Trafficking and Corrupting Another with Drugs caused separate, identifiable harm, and so were of dissimilar import, and the offenses were committed with a separate animus or motivation.

{¶72} The offense of Trafficking involved two persons, Stevens and Sheesley. Stevens contacted Patterson and arranged the sale. When Patterson arrived at the apartment, it became evident that the purchase was being made on behalf of Sheesley. Patterson's conduct with respect to Stevens was necessarily different than to Sheesley. It was no longer a matter of selling heroin to Stevens, but selling heroin to Stevens for the purpose of furnishing the drug to Sheesley. *Compare State v. Simmons*, 7th Dist. Jefferson No. 06 JE 4, 2007-Ohio-1570, ¶ 162 (recognizing, pre-*Johnson*, that Trafficking and Corrupting Another with Drugs are not always committed by the same conduct: "inducing or causing a juvenile to commit a felony drug abuse offense does not require any sale or offer to sell"). The harm (import) from the sale of heroin to an adult (Stevens) is distinct from the harm (import) from the sale of heroin to a juvenile (Sheesley). That such a distinction was contemplated by the legislature is evidenced by the enhanced penalties prescribed when Trafficking and Corrupting Another with Drugs involve a juvenile.

{¶73} Consistent with the determination that the two offenses were of dissimilar import, they were motivated by a distinct state of mind/animus. As noted by the State:

21

"[b]y corrupting, as opposed to trafficking, [Patterson's] motivation changes from one of profit to one addicting a minor to a dangerous drug." Appellee's brief at 21.

{¶74} We will now analyze the act of selling/furnishing heroin to a juvenile with Count 1, Reckless Homicide. To commit Reckless Homicide, the offender must "recklessly cause the death of another." R.C. 2903.041. The State had predicated the original charge, Involuntary Manslaughter, on the commission of either Trafficking in Heroin or Corrupting Another with Drugs as predicate offenses. The jury convicted Patterson of Reckless Homicide as a lesser included offense of Involuntary Manslaughter. It follows that it is at least possible to base a conviction for Reckless Homicide on conduct constituting Corrupting Another with Drugs/Trafficking in Heroin.

{¶75} Patterson's conviction for Reckless Homicide is evidenced by distinct conduct and animus. By acquitting Patterson of Involuntary Manslaughter, predicated on the underlying charges of Corrupting Another with Drugs/Trafficking in Heroin, the jury necessarily considered Patterson's conduct outside of the predicate offenses in finding him guilty of Reckless Homicide.[3] After the sale of the heroin, Stevens, concerned about Sheesley's failure to regain consciousness, called Patterson back to the apartment. According to both Stevens and Hugel, Patterson gave assurances that Sheesley would be fine, and so dissuaded them from seeking medical attention for Sheesley and contributed to her death. Patterson's return to the apartment after the sale of the heroin was completed constituted additional conduct with a separate animus,

---

3. To commit the offense of Involuntary Manslaughter, the offender must "cause the death of another * * * as a proximate result of the offender's committing * * * a felony." R.C. 2903.04(A). The jury found Patterson guilty of both predicate felonies – Corrupting Another with Drugs and Trafficking in Heroin – but acquitted him of the Manslaughter charge. Therefore, the jury must have determined that Sheesley's death was not the proximate result of the conduct constituting Corrupting Another with Drugs/Trafficking in Heroin.

22

thus preventing the Reckless Homicide charge from merging with the Corrupting Another with Drugs and Trafficking in Heroin charges. *State v. Jones*, 11th Dist. Trumbull No. 92-T-4764, 1993 Ohio App. LEXIS 6060, 11 (Dec. 17, 1993) (actions, when separated by time and/or distance, may constitute distinct criminal acts); *State v. Estes*, 12th Dist. Preble No. CA2013-04-001, 2014-Ohio-767, ¶ 22 (Abuse of a Corpse and Arson charges did not merge where the offender doused the victim's body with gasoline, left the scene, and later returned to light it on fire).

**{¶76}** Patterson maintains that the Ohio Supreme Court's holding in *Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, precludes the conclusion that the counts should not merge based on Patterson's conduct after returning to Stevens' apartment. In *Johnson*, the defendant was convicted of Felony Murder, based upon the predicate offense of Child Endangering, and Child Endangering. *Id.* at ¶ 53. The evidence was that Johnson was engaged in beating the child-victim, but was interrupted by the intervention of the victim's mother. After the mother's departure, Johnson continued the beating which resulted in the victim's death. *Id.* at ¶ 54. The State argued that there were "two separate incidents of abuse, separated by time and brief intervention by Milton's mother." The Supreme Court "decline[d] the invitation * * * to parse Johnson's conduct into a blow-by-blow in order to sustain multiple convictions for the second beating," and found that "[t]his beating was a discrete act that resulted in the simultaneous commission of allied offenses, child abuse and felony murder." *Id.* at ¶ 56.

**{¶77}** *Johnson* is factually distinguishable. Patterson's conduct on the night of April 6, 2012, did not constitute a "discrete act." Patterson's initial presence at Stevens'

23

apartment was for the sole purpose of selling the heroin. That action was completed and Patterson departed. Patterson's return to the apartment several hours later was occasioned by Stevens' anxiety over Sheesley's failure to regain consciousness. Unlike *Johnson*, Patterson did not return to resume a course of action already begun during the first appearance. Patterson's return may have been a consequence of the earlier sale of heroin, but it was not a continuation of that sale.

{¶78} *Johnson* is also distinguishable because, in that case, the defendant's Felony Murder conviction was predicated upon Child Endangering, i.e., the act of Child Endangering was an essential element in the crime of Felony Murder. As noted above, Patterson's conviction was for Reckless Homicide which was not predicated upon the Trafficking charge. Thus, the jury was free to consider whether Patterson's conduct as a whole that evening, not merely the sale of the heroin, contributed to Sheesley's death.

{¶79} The third assignment of error is without merit.

{¶80} In the fourth assignment of error, Patterson argues there was insufficient evidence to submit the Involuntary Manslaughter and two Corrupting Another with Drugs charges to the jury, and that his Reckless Homicide and Corrupting Another with Drugs convictions were against the manifest weight of the evidence.

{¶81} The manifest weight of the evidence and the sufficiency of the evidence are distinct legal concepts. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44. With respect to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

24

paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶82} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶83} In order to convict Patterson of Involuntary Manslaughter, the State was required to prove, beyond a reasonable doubt, that he "cause[d] the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). For the lesser included offense of Reckless Homicide, the State was required to prove that he "recklessly cause[d] the death of another." R.C. 2903.041(A). "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

25

**{¶84}** In order to convict Patterson of Corrupting Another with Drugs, the State was required to prove, beyond a reasonable doubt, that he "knowingly * * * [b]y any means, administer[ed] or furnish[ed] to another * * * a controlled substance, and thereby cause[d] serious physical harm to the other person" (Count 2), and "[b]y any means * * * [f]urnish[ed] or administer[ed] a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard" (Count 3). R.C. 2925.02(A)(3) and (4)(a).

**{¶85}** With respect to the Corrupting Another with Drugs charges, Patterson maintains that there was insufficient evidence that he "administer[ed] or furnish[ed]" a controlled substance to Sheesley, since the evidence only demonstrated that the drug transaction occurred between Patterson and Stevens. We disagree.

**{¶86}** "Furnished," as defined for the jury, meant "provided, supplied or gave access to." It does not matter if the heroin was sold or delivered directly to Stevens, provided that the sale gave Sheesley access to it. According to Hugel's testimony, Sheesley gave the money to Stevens who gave it to Patterson. According to Stevens' testimony, he told Patterson that Sheesley was purchasing the heroin. Accepting either witness' version of events (in a light most favorable to the State), there was sufficient evidence that Patterson knew he was giving Sheesley access to heroin by the sale to or through Stevens. *State v. Schwab*, 4th Dist. Athens No. 12CA39, 2014-Ohio-336, ¶ 3 (testimony that the appellant "kept his medications in a kitchen cabinet, to which anyone in the home had access" was sufficient evidence of furnishing drugs to another); *State v. Hardison*, 9th Dist. Summit No. 23050, 2007-Ohio-366, ¶ 29-30 (testimony that

appellant hid drugs in a minor's dresser drawer was sufficient evidence of furnishing drugs to another).

{¶87} With respect to Corrupting Another with Drugs (Count 3), Patterson maintains that there was insufficient evidence that he recklessly, i.e., "with heedless indifference to the consequences, * * * perversely disregard[ed] a known risk that such circumstances are likely to exist," furnished a controlled substance to a juvenile two years his junior. Former R.C. 2901.22(C); R.C. 2907.01(I) ("'[j]uvenile' means an unmarried person under the age of eighteen"). We disagree.

{¶88} Stevens testified that he was eighteen years old on the date of Sheesley's death and that he had known Patterson for several years. It is reasonable to infer that Patterson would be aware of Stevens' approximate age and that his friends would be of a similar age. Moreover, the jury was able to view Hugel, who was present and of the same age as Sheesley, and pictures of Sheesley, both alive and deceased. Thus, the jury could determine based on the appearance of the persons present at Stevens' apartment whether Patterson acted recklessly as to Sheesley's age.

{¶89} With respect to Involuntary Manslaughter, Patterson maintains that there was insufficient evidence that Sheesley's death was the proximate result of the sale of heroin. "It is impossible to suggest that Appellant could have foreseen as a consequence of his drug sale to Mr. Stevens that Stevens would, subsequently, inject Ms. Sheesley with heroin and that she would, subsequently, die as a result of said injection." Appellant's brief at 14-15. We disagree.

{¶90} There are several cases upholding convictions for Involuntary Manslaughter predicated on drug trafficking and/or possession. *State v. Shoemaker*,

27

3rd Dist. Union No. 14-06-12, 2006-Ohio-5159, ¶ 68 ("Justin's death, resulting from a morphine overdose, could have reasonably been anticipated by an ordinarily prudent person as likely to result from Shoemaker's trafficking in morphine"); *State v. Baksi*, 11th Dist. Trumbull No. 98-T-0123, 1999 Ohio App. LEXIS 6271, 44 (Dec. 23, 1999) ("appellant prepared an extremely strong hit of heroin and * * * he subsequently gave the loaded syringe to another inmate who was known to abuse drugs"); *State v. Grunden*, 65 Ohio App.3d 777, 783-784, 585 N.E.2d 487 (3rd Dist.1989) ("reasonable minds could readily have concluded at the close of the state's case that the infant's death was proximately caused by the defendant's conduct in leaving a gram of cocaine unattended on a coffee table").

{¶91} Patterson counters that these cases are distinguishable (at least *Shoemaker* and *Baksi*) in that the offenders personally administered and/or furnished the drugs to the decedents. We find the distinction to be immaterial as to whether the deaths proximately resulted from the offenders' drug activity. The possibility of overdose is a reasonably foreseeable consequence of the sale of heroin.

{¶92} In the present case, the evidence showed that Patterson sold heroin that he knew was being purchased with Sheesley's money and so he could reasonably assume that she would use the heroin. Several hours later, Patterson was contacted by Stevens who was becoming agitated by Sheesley's failure to regain consciousness. Fully aware that the heroin he sold caused her to be in that state, Patterson failed to seek medical attention or have such attention sought on her behalf. The failure to do so resulted in her death from acute pneumonia. Based on the foregoing evidence, there

28

was sufficient evidence to support Patterson's convictions, and those convictions were not against the manifest weight of the evidence.

{¶93} The dissent would reverse the conviction for Reckless Homicide on the grounds that the State failed to introduce evidence that Sheesley would have survived had medical attention been sought. Such a conclusion, however, could be reasonably inferred from the testimony of Dr. Germaniuk, who described the conditions leading to the onset of acute pneumonia. According to Dr. Germaniuk's testimony, the cause of the pneumonia was the entry of secretions into the lungs resulting from Sheesley's depressed respiratory system. It does not require expert testimony to infer that the longer Sheesley remained in a catatonic state, the greater the likelihood that pneumonia would develop.

{¶94} The dissent also fails to appreciate that Patterson's conviction for Reckless Homicide does not merely rest on his furnishing the heroin to Sheesley, but his subsequent advice to Stevens and Hugel that Sheesley would be "all right" and needed rest, rather than medical attention. While every incidence of heroin use may "not [be] substantially likely to cause death" (*infra* at ¶137), the failure to seek medical attention for one already in a heroin-induced coma is evidence of a substantial and unjustifiable risk that such conduct is likely to, and in this case did, result in death.

{¶95} The fourth assignment of error is without merit.

{¶96} In the fifth assignment of error, Patterson argues the trial court erred by increasing his sentence for Tampering with Evidence from two to three years, after realizing that a four-year sentence could not be imposed for Reckless Homicide, being a

third-degree felony. R.C. 2929.14(A)(3)(b) (maximum prison sentence for third-degree felony is thirty-six months).

**{¶97}** "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2); *State v. Belew*, 140 Ohio St.3d 221, 2014-Ohio-2964, 17 N.E.3d 515, ¶ 10-12.

**{¶98}** The overriding purposes of felony sentencing in Ohio "are to protect the public from future crime by the offender * * * and to punish the offender." R.C. 2929.11(A). "A sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing set forth in division (A) of this section, commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B).

**{¶99}** It is well-recognized that a sentencing court "has discretion to determine the most effective way to comply with the purposes and principles of sentencing." R.C. 2929.12(A). The Ohio Supreme Court has described a sentencing court's discretion as "full discretion to impose a prison sentence within the statutory range." *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, paragraph three of the syllabus; *State*

*v. Ries*, 11th Dist. Portage No. 2008-P-0064, 2009-Ohio-1316, ¶ 13 ("[s]uch discretion is plenary"). "[T]he trial court is not obligated, in the exercise of its discretion, to give any particular weight or consideration to any sentencing factor." *State v. Holin*, 174 Ohio App.3d 1, 2007-Ohio-6255, 880 N.E.2d 515, ¶ 34 (11th Dist.).

{¶100} At the sentencing hearing, the trial court orally pronounced a forty-eight month sentence for Reckless Homicide and a twenty-four month sentence for Tampering with Evidence. After being advised that the maximum possible sentence for Reckless Homicide was thirty-six months, the court acknowledged "some typos in my sentencing notes" and that it would "make an amendment." The court stated the sentences for Reckless Homicide and Tampering with Evidence would both be thirty-six months, which maintained the aggregate sentence as "the same total of 20 years."

{¶101} Patterson contends that it was improper for the trial court to increase the prison term for Tampering with Evidence in order to maintain an aggregate sentence of twenty years: "such a decision must still be based upon a trial court's consideration of the factors set forth in the sentencing statutes and not based upon a whim or desire that a total sentence be of a certain length." Appellant's brief at 26.

{¶102} With respect to sentencing for multiple offenses, the Ohio Supreme Court has held that "the judge lacks the authority to consider the offenses as a group and to impose only an omnibus sentence for the group of offenses." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 9. "Instead of considering multiple offenses as a whole and imposing one, overarching sentence to encompass the entirety of the offenses as in the federal sentencing regime, a judge sentencing a defendant pursuant to Ohio law must consider each offense individually and impose a separate

31

sentence for each offense." *Id.* (rejecting what has been referred to as the "sentencing-package doctrine").

**{¶103}** Relying on these pronouncements in *Saxon*, several courts of appeals have held that it is error for a trial court to lengthen particular individual sentences in order to maintain a consistent aggregate sentence. *State v. Edwards*, 6th Dist. Wood No. WD-13-037, 2014-Ohio-2436, ¶ 12 ("where the trial court has expressly referred without elaboration to the exact same set of findings and factors in both sentencings, we are not convinced that the record in support of the resentence to a higher prison term is sufficient") (citation omitted); *State v. Quinones*, 8th Dist. Cuyahoga No. 97054, 2012-Ohio-1939, ¶ 10 (the trial court erred "[b]y increasing the length of the remaining rape count to effectuate its original intent to have him serve five years"); *State v. Bradley*, 2nd Dist. Champaign No. 06CA31, 2008-Ohio-720, ¶ 35 ("[t]he trial court erred when it imposed harsher sentences in order to serve the purposes and principles of sentencing with respect to the aggregate of the four separate offenses the court imposed").

**{¶104}** These cases are distinguishable from the present case. In the cases cited, the trial courts imposed the lengthier prison sentence for a particular offense on remand. In other words, the sentences in those cases had become final and were subsequently reversed on appeal. In resentencing, the courts re-imposed the same aggregate sentence by enhancing particular individual sentences without providing a valid explanation for the enhancements. *Edwards* at ¶ 13; *Quinones* at ¶ 11.

**{¶105}** In the present case, the trial court adjusted Patterson's sentence, as it explained, based on "some mistakes in my own notes." As noted by the State, the adjustment occurred before the sentencing hearing had concluded or a written entry

was journalized. "[A]ny oral pronouncements by [the court are] subject to revision before journalization," inasmuch as a "court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum." (Citation omitted.) *State ex rel. Marshall v. Glavas*, 98 Ohio St.3d 297, 2003-Ohio-857, 784 N.E.2d 97, ¶ 5. Given that "oral pronouncements by a trial court judge are subject to revision before journalization[,] * * * [c]ourts may increase sentences when the sentence does not constitute a final order." *State v. Fought*, 6th Dist. Lucas No. L-10-1348, 2011-Ohio-4047, ¶ 13; *State v. Singfield*, 9th Dist. Summit No. 24576, 2009-Ohio-5945, ¶ 22 (citation omitted).

{¶106} Accordingly, we find no abuse of discretion in the trial court's adjustment of Patterson's sentence for Tampering with Evidence upon the discovery of the erroneous sentence for Reckless Homicide.

{¶107} The fifth assignment of error is without merit.

{¶108} In the State's sole assignment of error on cross-appeal, it contends that the trial court erred in merging Counts 5 and 6 (Trafficking in Heroin), with the State electing to proceed on Count 6. We agree.

{¶109} In Count 5, the jury found Patterson guilty of Trafficking in Heroin in an amount that "equals or exceeds one gram but less than five grams." Specification #1 to Count Five of the Indictment. Count 5 was based on the heroin sold to and recovered from the confidential informant. R.C. 2925.03(A)(1) ("[n]o person shall knowingly * * * [s]ell * * * a controlled substance"). In Count 6, the jury found Patterson guilty of Trafficking in Heroin in an amount that "equals or exceeds five grams but less than ten grams." Specification #1 to Count Six of the Indictment." Count 6 was based on the

33

heroin recovered from the vehicle Patterson was operating. R.C. 2925.03(A)(2) ("[n]o person shall knowingly * * * [p]repare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance").

{¶110} Applying the analysis set forth above under Patterson's third assignment of error, we find the two counts of Trafficking in Heroin were motivated by a different animus and were based on different conduct and physical evidence. A certain amount of heroin was sold to Thomas, and a certain amount of heroin, prepared for distribution, was retained for subsequent sale to other persons. Thus, it was error for the trial court to merge the two counts. *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 21 (convictions under R.C. 2925.03(A)(1) and (2) did not merge, where "Lewis sold less than five grams of crack cocaine to an undercover agent, left the scene, and when stopped by law enforcement, discarded other crack cocaine rocks, and a bag of crack cocaine rocks was found near him after he was tackled").

{¶111} The State's sole assignment of error on cross-appeal is with merit.

{¶112} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas is affirmed in part and reversed in part. This case is remanded for resentencing with instructions for the trial court to impose sentence for Count 5 (Trafficking in Heroin). In all other respects, Patterson's convictions and sentence are affirmed. Costs to be taxed against the appellant.


THOMAS R. WRIGHT, J., concurs in part and dissents in part with a Concurring/Dissenting Opinion,

COLLEEN MARY O'TOOLE, J., concurs in part and dissents in part with a Concurring/Dissenting Opinion.

34

_____

THOMAS R. WRIGHT, J., concurs in part and dissents in part with a Concurring/Dissenting Opinion.

{¶113} I concur with the majority's disposition of Patterson's first, second, and fifth assignments, as well as the state's cross-appeal. I dissent, however, on the third and fourth assignments.

{¶114} Regarding appellant's third assignment of error, counts three and four merge as allied offenses of similar import. R.C. 2941.25(A). Although the trial court made a dual-motive finding, we owe no deference as merger issues are questions of pure law that are reviewed de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶1.

{¶115} In *Johnson*, the court strongly cautioned appellate courts from over analyzing a defendant's conduct in order to avoid merger. Specifically, it found that two separate beatings, divided only by a brief break, did not warrant the imposition of the two distinct offenses of child abuse and felony murder. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶56. In finding that the child abuse and felony murder charges merged, the court expressly refused "to parse Johnson's conduct into a blow-by-blow [analysis] in order to sustain multiple convictions for the second beating." *Id.* Although *Johnson* addressed conduct, the same applies to animus. Absent evidence clearly showing that a defendant had dual motives while performing a *single* act, courts should not surmise such.

35

**{¶116}** Turning to the fourth assignment, the majority operates under the misconception that reckless homicide is a lesser included offense of involuntary manslaughter when it clearly is not. "An offense may be considered a lesser included offense of another when (1) one offense carries a greater penalty than the other; (2) the greater offense cannot be committed without the lesser included offense also being committed; and (3) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Evans,* 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889.

**{¶117}** Involuntary manslaughter requires proof that an offender caused the death of another as a proximate result of the offender committing a felony, R.C. 2903.04(A), while reckless homicide requires proof that the offender recklessly caused the death of another, regardless of whether the reckless conduct constitutes a felony. R.C. 2903.041(A). Involuntary manslaughter can be committed without reckless homicide also being committed. Accordingly, although defense counsel requested the reckless homicide instruction, it should not have been given.[4]

**{¶118}** As the state did not charge reckless homicide and since it is not a lesser included offense of involuntary manslaughter, appellant's recklessness, if any, and whether such *caused* Sheesley's death were not the issues being tried. If, then, as, the majority concludes, the state carried its burden, it did so coincidentally and fortuitously.

**{¶119}** There is one act and one omission that arguably support the reckless homicide conviction, specifically, the heroin sale and Patterson's failure to secure medical attention.

---

4.    Defense counsel requested a reckless homicide instruction *after* the close of evidence.

**{¶120}** Viewed through the reckless homicide prism as opposed to involuntary manslaughter, the state was required to prove beyond a reasonable doubt that Patterson recklessly caused Sheesley's death. R.C. 2903.041(A); R.C. 2901.05(A). "Cause" is defined as "an act or failure to act which in a natural and continuous sequence directly produces the (death) * * *, and without which [the death] would not have occurred." Section 417.23 Ohio Jury Instruction (2015).

**{¶121}** Unlike involuntary manslaughter, which adopts the culpable mental state of the underlying criminal offense, a reckless homicide charge requires proof beyond a reasonable doubt that Patterson *recklessly caused* Sheesley's death. R.C. 2903.04; *Stanley v. Turner*, 6 F.3d 399, 402, 1993 U.S. App. LEXIS 25688.

**{¶122}** "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a *substantial* and unjustifiable risk that the person's conduct is *likely* to cause a certain result or is likely to be of a certain nature." (Emphasis added.) R.C. 2901.22(C).

**{¶123}** Risk is defined as a "significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(7). Whereas a "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

**{¶124}** The drafters of R.C. 2901.22, defining "Culpable mental states" based the definition of reckless on the analysis in *Roszman v. Sammett*, 26 Ohio St.2d 94, 269 N.E.2d 420 (1970).[5] R.C. 2901.22 *Committee Comment to H 511* (1974). *Roszman*

5. The *Roszman* court used the term "wanton misconduct" in place of recklessness.

37

outlines the requisite proof needed to establish "recklessness" as requiring evidence that a defendant "shows all absence of care or an absolute perverse indifference to the safety of others, *knowing* of a dangerous situation, yet failing to use ordinary care to avoid injury to others." (Emphasis added.) *Id.* at 98. "Such perversity on the part of the [defendant] must be found to be under such circumstances and existing conditions that the party doing the act, or failing to act, must be conscious from his knowledge of such surrounding circumstances and existing conditions that his conduct will, in all probability, result in injury." (Citation omitted.) *Id.* at 97.

{¶125} "The State must prove, beyond a reasonable doubt, therefore, that the defendant had a subjective realization of a substantial and unjustifiable risk and a conscious decision to ignore it." *State v. Theriault*, 1993 Conn. Super LEXIS 3056, 10 (Oct. 7, 1993) (holding in part that the defendant's sale of heroin was insufficient to support her conviction for reckless homicide), citing *State v. Jupin*, 26 Conn. App. 331, 602 A.2d 12 (1992).

{¶126} In *State v. Peck*, 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263, the court reversed Peck's conviction of reckless homicide since there was insufficient evidence establishing that Peck recklessly caused the death of a driver of a passing car. Peck was a tow truck operator who failed to realize that the tow truck he was operating had an underrated snatch block attached for the heavy tow in issue. Peck did not realize that the snatch block would fail. The snatch block broke and was catapulted into the windshield of an unsuspecting motorist. The evidence did not prove that Peck knew of the risk associated with his conduct, i.e., he was *unaware* that he was using the

38

wrong equipment that ultimately resulted in the accident and the death of a passing driver, and as such, it did not support his conviction for reckless homicide. *Id.* at 32.

{¶127} *Peck* explained that the defendant's "mere failure to perceive or avoid a risk, because of a lack of due care, does not constitute reckless conduct." *Id.* at 29 citing *Columbus v. Akins*, 10th Dist. Franklin No. 83AP-977, 1984 Ohio App. LEXIS 10935 (Sept. 27, 1984). Instead, one who acts recklessly "is *aware* of the risk and disregards it; [whereas,] the negligent actor is *not aware* of the risk but should have been aware of it." *Id.* at 30 citing Wharton's Criminal Law, 15th Ed., Section 27, at 170 (Emphasis sic). In assessing whether a defendant acts recklessly, a court must "assess the defendant's knowledge of the specific risk created by the defendant's conduct, *not the defendant's knowledge of the general risk inherent in the activity*, in determining criminal liability for reckless homicide. Otherwise, there could be criminal liability for even negligent conduct whenever the defendant is aware that he is engaged in an inherently dangerous activity." (Emphasis added.) (Citation omitted.) *Id.* at 31.

{¶128} "While heroin is a truly dangerous drug, it is also an accepted fact that the injection of heroin into the body does not generally cause death in the normal heroin transaction." *Napier v. State*, 357 So.2d 1001, 1009, 1977 Ala. Crim. App. LEXIS 1531 (June 28, 1977) (holding that the sale of heroin in that case supported the murder conviction based on the defendant's knowledge of the potency and high quality of the heroin; he knew another friend had nearly overdosed on the same batch; and since the defendant had asked his friends to "test" the heroin to aid him in cutting the heroin for sale.)

39

{¶129} In *Lofthouse v. Commonwealth*, 13 S.W.3d 236 (Ky. 2000), the Supreme Court of Kentucky reversed the defendant's reckless homicide conviction that arose from supplying heroin and cocaine to his friend. Joseph Lofthouse arrived at the home of Jerry Buford with cocaine and heroin that he obtained from his regular drug dealer. The two initially drank beer and ingested cocaine together. Hours later they drank more beer and decided to try the heroin as suggested by the dealer as "something new." Buford ultimately died as a result of his lethal ingestion of cocaine, ethanol, and morphine. Lofthouse was convicted by a jury of two counts of trafficking in a controlled substance and reckless homicide. *Id.* at 237-238.

{¶130} The court of appeals affirmed his convictions, but the Kentucky Supreme Court disagreed with his reckless homicide conviction based on the lack of evidence. It explained: "the Commonwealth needed to prove not only the toxic qualities of cocaine and heroin, but also that a layperson, such as [Lofthouse], should have reasonably known that there was a substantial risk that the amount of cocaine and heroin ingested by Buford would result in his death. That is especially true where, as here, [Lofthouse] did not directly cause the victim's death, but only furnished the means by which the victim caused his own death." *Id.* at 241.

{¶131} The Supreme Judicial Court in *Commonwealth v. Catalina*, 407 Mass. 779 (July 3, 1990), found that the facts surrounding the defendant's sale of heroin in that case were sufficient to support the indictment for manslaughter based on defendant's reckless conduct.[6] However, the defendant in *Catalina* was fully aware of the high potency of the type of heroin that he was selling at the time; he warned the victim of its

---

6. The Supreme Judicial Court did not consider whether there was sufficient evidence to support the conviction. Instead, it was considering an appeal from a motion to dismiss the defendant's indictment.

high potency; he knew that the victim had overdosed before; and he knew this type of heroin had nearly caused another's death. *Id.* at 781-782.

{¶132} Further, in *People v. Cruciani*, 36 N.Y.2d 304 (1975), New York's highest court affirmed the defendant's manslaughter conviction based on reckless conduct in injecting a narcotic in the victim's arm. The court agreed with the jury's decision because the defendant admittedly injected the victim with heroin when she was already "completely bombed out" on depressants and could neither fully walk nor talk. *Id.* Thus, there was sufficient evidence that the defendant was *aware* and consciously disregarded a substantial and unjustifiable risk that the victim was highly susceptible to overdose in light of her condition at the time the defendant injected the heroin. Thus, he recklessly caused her death.

{¶133} In *Commonwealth v. Bowden*, 456 Pa. 278, 309 A.2d 714 (1973), the Pennsylvania Supreme Court agreed that the defendant's second-degree murder charge was improper because it was founded on his injection of heroin into his friend who later died from an adverse reaction. The two men were addicts. The court held that the defendant had not committed an act of gross recklessness because he injected the victim with a dose of heroin that was usually tolerable for an addict, and the medical testimony supported that the amount of heroin ingested would not normally cause death in an addict. It explained, "the injection of heroin into the body does not generally cause death. Unfortunately, there are thousands of individuals who use or abuse heroin daily. * * * 'While there has recently been a substantial increase in deaths from narcotics, the proportion of such deaths to the number of times narcotics are currently being used by addicts and for legal medical treatment is not nearly great enough to justify an

41

assumption by a person facilitating the injection of a narcotic drug by a user that the latter is thereby running a substantial and unjustified risk that death will result from that injection.'" *Id.* at 284, quoting *People v. Pinckney*, 328 N.Y.S. 2d 550, 556-557 (App.Div.1972). Thus, and based on the facts before it, "Bowden could not [have] 'reasonably anticipate[d] that death * * * was likely to result." *Id.* at 285; *see also State v. Dixon*, 109 Ariz. 441, 511 P.2d 623 (1973) (holding that the sole act of selling heroin does not support a second-degree murder charge when the drugs were ingested out of the presence of the seller.)

{¶134} There was insufficient evidence to support Patterson's reckless homicide conviction based on his sale of heroin. The question of legally sufficient evidence is a matter of law, requiring an appellate court to "'view the evidence in a light most favorable to the prosecution, [and determine] whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Peck*, 172 Ohio App.3d 25, 28, 2007-Ohio-2730, 872 N.E.2d 1263, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 paragraph two of the syllabus (1991).

{¶135} In concluding that the sale of heroin could be sufficient to rise to the level of recklessness, the majority simply assesses the general risks inherent in the activity of heroin dealing. This is problematic because it essentially substitutes a negligence standard for the applicable recklessness standard, thereby impermissibly lowering the state's burden of production.

{¶136} As indicated above, to rise to the level of recklessness, a court must analyze a defendant's knowledge of the *specific risks* created by his or her conduct.

42

{¶137} Although heroin use is dangerous, it is not substantially likely to cause death. Accordingly, absent additional circumstances previously discussed, but not present in our case, Patterson, in selling heroin, did not disregard a substantial and unjustifiable risk. Therefore, the heroin sale does not support a reckless homicide conviction.

{¶138} The majority also concludes that the reckless homicide conviction is supported by Patterson's failure to seek medical help. As discussed by the majority, Sheesley had ingested heroin and, as a result, was in a catatonic state for hours before Patterson was informed. Moreover, Dr. Germaniuk testified that Sheesley died as a result of acute pneumonia caused by the heroin use. Although Patterson knew that Sheesley was unconscious, there is no evidence to suggest that he was aware that Sheesley had acute pneumonia. This condition was only revealed as a result of the autopsy.

{¶139} Patterson could not, therefore, consciously disregard the risk of Sheesley's progressing pneumonia without some foreknowledge of that condition. Without this necessary subjective scienter element, the existence of Sheesley's developing pneumonia has no bearing on Patterson's failure to seek medical attention.

{¶140} Further, even assuming it was reckless for Patterson not to seek medical attention in light of the circumstances, there was no evidence that his omission caused or likely caused Sheesley's death.

{¶141} When Patterson arrived at the apartment for the second time, Sheesley had already been in an unconscious state for several hours. From a medical standpoint, there is no evidence, whatsoever, as to the progression of her pneumonia at

43

that time and what, if anything, could have been done to save her. Accordingly, there is insufficient evidence on causation as no reasonable juror could conclude that Patterson's failure to act caused Sheesley's death. Whether this was a situation where prompt medical attention would have made a difference is speculative.

{¶142} Based on the foregoing, there is insufficient evidence to support Patterson's reckless homicide conviction and it should be vacated. As to all other issues, I concur.

_____

COLLEEN MARY O'TOOLE, J., concurs in part, and dissents in part, with a Concurring and Dissenting Opinion.

{¶143} I concur with the majority's well-reasoned disposition of Mr. Patterson's assignments of error. I respectfully dissent regarding its disposition of the state's assignment of error on cross-appeal. I agree with the learned trial court that Counts 5 and 6, both for trafficking in heroin, and arising from the controlled buy, properly merge.

{¶144} The majority cites to the Twelfth District's opinion in *Lewis*, *supra*, to support its conclusion that the two counts should not merge. The facts set forth in *Lewis* are minimal, to say the least, but are distinguishable from those presented here. Appellant in *Lewis* sold crack to an undercover officer in a controlled buy, from a car. *Id.* at ¶19. Thereafter, the car was stopped by police, and appellant fled, dropping crack as he ran. *Id.* Thus, *Lewis* presents a situation in which there were two, *distinct*, instances wherein drugs were discovered, separated by time and place.

44

{¶145} In this case, Mr. Patterson sold heroin to the confidential agent; police began to close in on his car; and Mr. Patterson tossed his remaining drugs into the backseat, to his companion's girlfriend. Practically speaking, it was one swift event – resulting in two counts of trafficking. In *Johnson*, *supra*, the defendant was beating a child; stopped when the boy's mother entered the room; then resumed the beating when she left. *Id.* at ¶54. The state obtained convictions for child abuse, and felony murder. *Id.* at ¶56. Defendant contended the crimes should merge, a conclusion with which the trial court and the First District disagreed. *Id.* at ¶3-5. The Supreme Court of Ohio found merit in defendant's contention. Relevantly, it stated, "We decline the invitation of the state to parse Johnson's conduct into a blow-by-blow in order to sustain multiple convictions for the second beating. This beating was a discrete act that resulted in the simultaneous commission of allied offenses, child abuse and felony murder." *Id.* at ¶56. The conduct forming the basis of the two counts merged by the trial court in this case is even less divisible than that in *Johnson*. By reversing the trial court's decision to merge Counts 5 and 6, we are engaging in the parsing of conduct disapproved by the *Johnson* court.

{¶146} I would affirm the judgment of the trial court in all respects.