[Cite as *State v. Price*, 2019-Ohio-1642.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No.   107096

---

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# MARK A. PRICE

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED; CONFLICT CERTIFIED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No.   CR-16-609930-A

**BEFORE:**   Boyle, P.J., Laster Mays, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**   May 2, 2019

**ATTORNEY FOR APPELLANT**

Susan J. Moran
55 Public Square, Suite 1616
Cleveland, Ohio    44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:   Jeffrey Schnatter
          Katherine Mullin
Assistant Prosecuting Attorneys
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio    44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Mark Price, appeals his convictions. He raises six assignments of error for our review:

1. The trial court erred by denying appellant's motion for acquittal pursuant to Crim.R. 29 when the state failed to submit sufficient evidence for the essential elements of the crimes charged denying the appellant due process.

2. Appellant's convictions are against the manifest weight of the evidence.

3. The trial court committed prejudicial error and/or plain error in violation of the Double Jeopardy Clause of the United States Constitution and Section 10, Article I of the Ohio Constitution when it failed to merge the two counts of corrupting another with drugs as they were allied offenses of similar import and were committed in a singular act with the same animus.

4. The trial court erred in imposing consecutive sentences as such a sentence was not supported by the record.

5. The trial court erred in failing to provide the [*Burrage v. United States*, 571 U.S. 204, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014)] instruction regarding proximate cause which resulted in the denial of due process and wrongful conviction of the appellant.

6. The trial court erred in failing to allow the appellant to present exculpatory evidence as a defense to corrupting another with drugs, violating his right to a fair trial and due process.

{¶2} Finding merit to Price's third assignment of error, we affirm in part, reverse in part, and remand for the trial court to merge Price's convictions for corrupting another with drugs and allow the state to elect which of the convictions it wishes to pursue at sentencing.

## I. Procedural History and Factual Background

{¶3} On September 19, 2016, the Cuyahoga County Grand Jury indicted Price on 22 counts. The charges stemmed from the victim dying of an alleged overdose on August 2, 2016, and separate alleged drug activities on August 4, 2016. Those charges were as follows:

> August 2, 2016: One count of involuntary manslaughter, in violation of R.C. 2903.04(A); two counts of corrupting another with drugs, in violation of R.C. 2925.02(A)(3) (one for heroin and one for fentanyl); two counts of trafficking, in violation of R.C. 2925.03(A)(1) (one for heroin and one for fentanyl); two counts of trafficking, in violation of R.C. 2925.03(A)(2) (one for heroin and one for fentanyl); and two counts of drug possession, in violation of R.C. 2925.11(A) (one for heroin and one for fentanyl).
>
> August 4, 2016: Three counts of trafficking, in violation of R.C. 2925.03(A)(1) (two heroin and one for fentanyl); four counts of trafficking, in violation of R.C. 2925.03(A)(2) (two for heroin and two for fentanyl); four counts of drug possession, in violation of R.C. 2925.11(A) (two for heroin and two for fentanyl); one count of tampering with evidence, in violation of R.C. 2921.12(A)(1); and one count of possessing criminal tools, in violation of R.C. 2923.24(A).

All of the August 2 charges (except drug possession) contained a school yard specification. Except for the count for tampering with evidence, all of the counts had forfeiture specifications. Price pleaded not guilty, and the case proceeded to a jury trial in February 2018.

{¶4} On August 2, 2016, police officers responded to the victim's apartment for a report of a deceased male. After securing the scene, police collected evidence from the victim's apartment, including "a white pinkish powder residue and * * * a straw, which is commonly used for drug use[,]" six pills near the victim's body, an ATM receipt from 1:00 a.m. that morning showing that $220 was withdrawn from the victim's account, and

the victim's cell phone. Police also found what appeared to be heroin residue on the victim's nightstand, but did not collect that residue.

{¶5} When searching through the victim's phone, police found text messages to and from a contact identified as "T" occurring around 3:00 a.m. on August 2 that were indicative of drug activity. Detective Amelio Leanza testified that he understood the conversation as meaning that "[the victim's] buying the drugs, but he's going to supply this person T with a portion of it for arranging it." Detective Leanza said it also showed that "the person that's bringing the drugs is about to pull up * * * [and does not] want to meet anybody else" and explained that "it's common for a dealer to maybe only trust a certain clientele of theirs and not so much a person they've never met." The call log from the victim's cell phone also showed calls to "T" around 2:00 a.m. that morning.

{¶6} Police ran "T's" number through the department's computer system and found that it was associated with Tierra Fort, who lived in the same apartment complex as the victim. Police also found "that there were some prior disturbance calls to [the apartment complex] between [the victim] and Miss Fort over some civil matter[s]," giving police a possible connection between Fort and the victim.

{¶7} Police subsequently obtained an arrest warrant for Fort and a search warrant for her address. After arresting Fort, police searched her apartment, finding a digital scale, "some crushed up powder that was similar in color [to the] pink-colored substance that [police] found in [the victim's apartment]," a plastic straw with residue, a "rock of that pink- and tan-colored substance[,]" and Fort's cell phone.

**{¶8}** During a police interview, Fort allowed police to search her cell phone and identified herself as the contact labeled "T" in the victim's phone. Police found the same text conversation that they found on the victim's cell phone, and Fort said that she had that conversation with the victim because he "wanted heroin and he was only able to get it through her" and that she "middle[d]" the sale to the victim.

**{¶9}** Detective Leanza explained that "middling a deal" meant a person who "typically * * * [has] a contact * * * that they can get heroin from versus the other person who cannot or maybe their supplier had been locked up or arrested, so they'll go through the other person because they know that this other person has a contact." He also stated that "it's very common for that other person to not want to give up their contacts because they get to get a piece of heroin for arranging a sale."

**{¶10}** Detective Leanza stated that he found another conversation on Fort's phone with a different phone number that he believed was indicative of drug activity and that Fort identified the person associated with that phone number as "Bam." Fort told police that she texted Bam on August 2 around 1:00 a.m. to obtain drugs for the victim. Fort's phone's call log also showed calls between Fort and Bam around that time.

**{¶11}** Because Fort did not know Bam's real name and a search of the police department's computer system did not produce any results for the phone number associated with Bam, police ran the number through Facebook and were able to identify Bam as Price. Police showed Fort a photo of Price from Facebook, and Fort confirmed that Price was Bam.

{¶12} During trial, Fort testified as to the events leading up to the victim's death. She said that after the victim contacted her requesting drugs and after she texted Price, Price arrived at her apartment around 3:00 a.m. and that he gave her a gram of heroin in a baggie. In exchange, Fort gave Price $100 that the victim had given to her. She then called the victim to come to her apartment, where he saw Price and they said "hello" to each other in her living room. She gave the victim the drugs, and before he left, the victim gave her about "$20 worth" of the heroin and she put that "rock" in a dish next to her bedroom.

{¶13} Detective Leanza stated that at that point, he decided to arrange controlled phone calls between Fort and Price to set up a drug purchase. Fort made those calls in his presence, which he recorded. Detective Leanza explained that Fort requested drugs from Price and that Fort and Price agreed to meet at the "RTA station on West 117th and Madison[.]"

{¶14} As part of their strategy, police arranged a "buy/point out," in which a sale is arranged, but no transaction occurs, and the "cooperating party points out [the drug dealer]" and police arrest that person. Fort was stationed with officers in an unmarked vehicle in the parking lot of the RTA station and other officers were stationed in additional unmarked vehicles in the parking lot.

{¶15} Detective Leanza testified that a blue Chrysler with a male driver pulled into the parking lot with Price in the passenger seat and that Fort identified Price. Once the car "pulled into a parking space[,]" officers surrounded the vehicle and ordered both

occupants out.    Detective Leanza described the arrests as follows during trial:

> We're in undercover vehicles, obviously.    We're not in marked vehicles. I pulled behind the vehicle.    So we're coming up from the rear of this blue Chrysler.    At that point, we're ordering people inside, Hands up, you know, Police, Hands Up.    We were wearing our vests that say in large white letters Police on the front, Police on the back.    I went to the passenger side because that's where I knew Mr. Price was.    He did have his hands up.    I opened the door.    [H]is phone was on his lap.    I removed him from the car and he was handcuffed.
>
> I believe I may have asked him his name or something like that, but he was not saying a word.    His mouth didn't open.    He wasn't saying anything. So I went around to the driver's side of the car[, where detectives] had the driver out.    I immediately *Mirandized* the driver because I knew I was going to want to talk to him right then and there. * * * He's identified as Michael Jacob.
>
> * * *
>
> I started walking [Price] towards the marked unit to be transported to jail. As I got closer to the car, he started pulling kind of downwards.    And I opened the back door already and I told him to put his leg in.    And he tried to put his leg up and he just started becoming limp.    He turned and he looked at me with this glazed look on his face.    And * * * I immediately knew he ingested some heroin.
>
> I called for the officer that showed up in the marked unit to give me his Narcan.    I lowered him to the ground and kept him sitting upright against my chest, and from behind I administered some of the nasal Narcan to counteract the effects of the opiate that he had just ingested.
>
> * * *
>
> At that point his mouth had kind of drooped open and there was a baggie sticking out of his mouth.    So [paramedics] removed the baggie.    I put on a pair of gloves.    And then they handed me the baggie and we placed it into an evidence bag.    Inside the bag was a mixture — was a pinkish-tan mixture with saliva.

{¶16} Detective Leanza testified that because the bag only contained a trace amount of a "pinkish-tan substance" once he pulled it from Price's mouth, he believed Price swallowed the bag's contents. He testified that the "pinkish-tan substance" was similar to the substances he observed in Fort's and the victim's apartments and that the "baggie" was sent to the lab for testing. Detective Leanza stated that they did not find any other drugs on Price. He also stated that police found drugs and drug paraphernalia in Jacob's car.

{¶17} Detective Leanza collected Price's cell phone, obtained a search warrant for the phone, and had it analyzed by the Bureau of Criminal Identification and Investigation. He said the analysis showed the same conversations and calls that were on Fort's phone from the morning of August 2. The phone also showed the recorded calls and text messages that Fort made in Detective Leanza's presence at the jail as part of the controlled buy. Price's phone also contained text messages to and from the phone of the driver and that those text messages indicated drug activity. Detective Leanza testified that there were other conversations with other unidentified numbers that were also indicative of drug activity.

{¶18} On cross-examination, Detective Leanza testified that he did not submit the victim's or Fort's phones for analysis and did not check to see if either of them obtained drugs from other persons that night. He also obtained an Ohio Risk Assessment Report ("ORAS"), which contained the victim's prescription information. According to the state, the ORAS report shows the historical record of people filling prescriptions.

**{¶19}** Dr. Felo, the chief deputy medical examiner and forensic pathologist for the Cuyahoga County Medical Examiner's Office, testified that he performed the victim's autopsy. Dr. Felo testified that the victim had "a history of substance abuse" as well as "some heart disease and some lung disease[,]" an enlarged heart, and congested lungs, all of which were caused by dilated cardiomyopathy. The victim also had "abnormal" and "heavy" lungs as well as pulmonary edema, "which is fluid build up" from "smoking tobacco products, marijuana products, [or] illicit drugs[.]" Dr. Felo said that before receiving the toxicology results, he believed the victim could have died simply based on the condition of his heart and lungs.

**{¶20}** As to the toxicology results, Dr. Felo stated that he collected "various body fluids and lung tissue" and that "several drugs * * * were identified in [the victim's] system[,]" including fentanyl and two antidepressants, mirtazapine and escitalopram, as well as continine, a "cigarette tobacco product" and diphenhydramine. Dr. Felo explained that the victim did not have a prescription for fentanyl.

**{¶21}** Dr. Felo testified that the two antidepressants and fentanyl were found in the victim's blood samples. He said that the levels of the antidepressants found in those samples "were to be expected for someone who is taking their medications at normal doses." As to the level of fentanyl, he stated that it was "at a significantly high level; one that is commonly seen with death."

**{¶22}** Explaining the effects of fentanyl, Dr. Felo said that it can cause "respiratory depression," which "causes the body to slow down breathing, and too much

of that can cause the lungs to essentially stop and then the person dies because the lungs aren't moving even though the heart is beating." He testified that while he was not sure of the victim's level of tolerance for fentanyl, the victim "died within 20 minutes of the fatal dose."

{¶23} Dr. Felo also explained that any drugs found in a person's urine "have been cleaned out by the body" and show a person's "historic use" of drugs, but he said that a person is no longer under the effects of drugs found only in the urine. Dr. Felo testified that the victim's urine sample "had the same drugs that were found in the blood" except for nicotine instead of the continine. He explained that codeine and morphine, which "are typically found in heroin as metabolites," were also found in the victim's urine. Dr. Felo concluded that the urine sample showed that the victim had "recently taken marijuana and heroin, but [because] they're not in his blood system[,] * * * [he was] not under the influence of those drugs when he died." He explained that traces of heroin were not found in his blood suggesting "that [the heroin had] already gone through his blood and [was] not at detectable levels, and so we're talking many minutes, perhaps hours, that he last had a dose of heroin."

{¶24} Dr. Felo concluded that the victim died "as a result of acute intoxication by the combined effects of escitalopram, fentanyl, and mirtazapine." He stated that he included the two antidepressants "because both * * * also can cause respiratory depression * * * [and] might slow down the heart rate" and that while "in and of itself the fentanyl is what is the primary cause, [he could not] rule out how much the other two

prescription drugs had a role, a very small role, but they did have a role." Dr. Felo categorized the victim's death as accidental due to the fentanyl. Without the fentanyl, he would have concluded that the victim died of "dilated cardiomyopathy with cardiomegaly" based on his "underlying enlarged and dilated heart."

{¶25} Dr. Felo then discussed a report authored by Price's toxicology and pharmacology expert, Dr. Robert Belloto, Jr., which opined that the victim's death was not drug-related and that the victim's lungs were not abnormally heavy and questioned "the validity of what the drug levels [were] largely because of the process called post-mortem distribution." Dr. Felo reviewed Dr. Belloto's report, but said that it did not change his opinion about the victim's death.

{¶26} Dr. Felo also stated that as part of his examination of the victim, he learned that the victim was a 20-year drug abuser, who had previously attempted suicide, had been in a coma, and had been in drug rehabilitation. He agreed that based on the toxicology report, the victim could have taken a combination of heroin and fentanyl and survived for a period of time.

{¶27} Meghan Peters, a forensic scientist and drug chemist for the Cuyahoga County Medical Examiner's Office, testified that the pinkish powder and the pen tube collected from the victim's apartment tested positive for heroin and fentanyl. She stated that the "rock" found in Fort's apartment also tested positive for heroin and fentanyl.

{¶28} After the state rested, Price moved for acquittal of all charges under Crim.R. 29, and the trial court denied his motion.

{¶29} Price then called Dr. Belloto, a pharmacist for Madison Health, who was recognized as an expert in toxicology and pharmacology for the trial. Dr. Belloto stated that he "reviewed the chemistry in this case" and wrote a report documenting his findings as to the victim's death. He opined in his report that it was "hard to specifically assert that a fentanyl overdose was the cause of death without further evidence that the fentanyl was ingested (or snorted) shortly before his collapse and not at a prior time." He further opined that the victim's "lungs [were] not overly heavy and [were] in the expected weights at autopsy." He concluded the following in his report:

> It appears [the victim] ingested a heroin and fentanyl mixture at least 3 hours and twenty minutes or most likely longer before his death. Though it could be shorter, the lack of heroin in his blood or urine indicates several hours had passed since the administration of the drugs. It is difficult to say that he died from the ingested drugs because the fentanyl and citalopram are subject to postmortem redistribution and were very likely not at toxic levels before death[.]

{¶30} Dr. Belloto testified that the medical examiner's office should have measured the concentration of drugs in the victim's system rather than just identify what drugs were present. He said that because the concentrations were not tested, the autopsy failed to establish whether the drugs were toxic. He also stated that the dosage levels in the autopsy could be "misleading" based on post-mortem redistribution, which his report explained "is where the drug level upon death is many times the level that would have been obtained had the individual been alive."

{¶31} Dr. Belloto agreed with Dr. Felo that the victim could have died as a result of cardiomegaly based on the victim's pulmonary edema and dilated heart. Dr. Belloto

testified that the victim's body had metabolized the heroin and that because it "had all been excreted, [it would have been] really hard to die of heroin if you've metabolized all of it." He explained that the victim would have had "to be alive for that period of time [to metabolize the heroin]." Dr. Belloto also said that it was unlikely that the fentanyl caused the victim's death because "[a]ll the drugs that were tested were a mixture of those, so if that would somehow have [caused] his death, [he] would expect to see different things at autopsy[.]"

{¶32} On cross-examination, Dr. Belloto agreed that he did not examine the victim's body and did not see slides of the victim's lungs. He also agreed that he had never performed an autopsy.

{¶33} Price then rested his case and renewed his Crim.R. 29 motion, which the trial court, again, denied.

{¶34} The jury found Price not guilty of involuntary manslaughter, but found him guilty of all of the remaining charges and attached specifications.

{¶35} The trial court found that the following convictions merged:

One count of trafficking heroin in violation of R.C. 2925.03(A)(1), one count of trafficking heroin in violation of R.C. 2925.03(A)(2), and one count of drug possession (heroin) in violation of R.C. 2925.11 merged into conviction for corrupting another with drugs (heroin) in violation of R.C. 2925.02(A)(3);
One count of trafficking fentanyl in violation of R.C. 2925.03(A)(1), one count of trafficking fentanyl in violation of R.C. 2925.03(A)(2), and one count of drug possession (fentanyl) in violation of R.C. 2925.11 merged into conviction for corrupting another with drugs (fentanyl) in violation of R.C. 2925.02(A)(3);

One count of trafficking in violation of R.C. 2925.03(A)(2) and one count

of drug possession in violation of R.C. 2925.11(A) merged into one count for trafficking in violation of R.C. 2925.03(A)(1);

One count of drug possession in violation of R.C. 2925.11(A) merged into trafficking in violation of R.C. 2925.03(A)(2);

One count for trafficking in violation of R.C. 2925.03(A)(2) and one count for drug possession in violation of R.C. 2925.11(A) merged into one count of trafficking in violation of R.C. 2925.03(A)(1);

One count for trafficking in violation of R.C. 2925.03(A)(2) and one count for drug possession in violation of R.C. 2925.11(A) merged into one count of trafficking in violation of R.C. 2925.03(A)(1).

The trial court then sentenced Price as follows:

Corrupting another with drugs (heroin):     8 years

Corrupting another with drugs (fentanyl):     8 years

Trafficking (heroin): 12 months

Trafficking (fentanyl): 12 months

Tampering with evidence: 12 months

Trafficking (heroin):     6 months

Trafficking (fentanyl): 12 months

Possessing criminal tools:     6 months

The court ordered that Price serve his 8-year sentences consecutive to one another and that the sentences for the remaining charges be served concurrently, giving Price an aggregate prison term of 16 years.   The trial court also advised Price that he would be subject to 5 years mandatory postrelease control upon his release from prison and imposed a $3,000 fine but waived court costs.

**{¶36}** It is from this judgment that Price now appeals.

## II. Law and Analysis

### A. *Burrage* Instruction

**{¶37}** Because part of Price's first assignment of error directly concerns an issue raised in his fifth assignment of error, we will address his fifth assignment of error first. In his fifth assignment of error, Price argues that the trial court abused its discretion and deprived him of due process by not providing the proximate cause instruction set forth in *Burrage v. United States*, 571 U.S. 204, 134 S.Ct. 881, 187 L.Ed.2d 715 (2014), which he requested.

**{¶38}** When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. *Berardi's Fresh Roast, Inc. v. PMD Ents., Inc.*, 8th Dist. Cuyahoga No. 93920, 2010-Ohio-5124, ¶ 12.

**{¶39}** In *Burrage*, the United States Supreme Court examined 21 U.S.C. 841(b)(1)(C), a federal sentencing statute that requires a mandatory prison sentence for defendants who unlawfully distribute certain drugs that cause death or serious bodily injury. The court held that

> where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U. S. C. §841(b)(1)(C) unless such use is a but-for cause of the death or injury.

*Id.* at 218-219. In other words, the court concluded that "use of the drug must have been

a but-for cause of the victim's death or injury" for a court to impose the mandatory prison term. *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir.2015), citing *Burrage*.

{¶40} Price cites to *State v. Kosto*, 5th Dist. Licking No. 17CA54, 2018-Ohio-1925, *discretionary appeal not allowed*, *State v. Kosto*, 153 Ohio St.3d 1469, 2018-Ohio-3450, 106 N.E.3d 66, in support of his argument. In *Kosto*, the Fifth District concluded that there was insufficient evidence to show that Kosto's actions of providing the victim with heroin were the proximate cause of the victim's death. *Id.* at ¶ 24. The Fifth District held that "the 'but-for causality' rationale of *Burrage* must also be applied to the element of 'causing serious physical harm' to another under R.C. 2925.02(A)(3)[.]" *Id.* at ¶ 29. The court stated that "just as in *Burrage*, 'no expert was prepared to say that the victim would have died from the heroin use alone.'" *Id.* at ¶ 23, quoting *Burrage*. The court also concluded that Kosto's conviction for corrupting another with drugs was not supported by sufficient evidence because there was a lack of expert testimony to establish that the victim's "heroin use *per se*" caused "serious physical harm" to the victim. *Id.* at ¶ 28.

{¶41} *Kosto*, however, is not the only Ohio appellate court to examine *Burrage* and its application to Ohio law. In *State v. Carpenter*, 3d Dist. Seneca No. 13-18-16, 2019-Ohio-58, the defendant relied on *Kosto* and *Burrage*, arguing that there was insufficient evidence supporting his convictions for corrupting another with drugs and involuntary manslaughter because the state did not show that the heroin distributed by the defendant independently caused serious physical harm to the victim. *Id.* at ¶ 47. The

Third District disagreed with the defendant's argument and distinguished the Fifth District's reasoning in *Kosto*, stating:

> [W]e part ways with the Fifth District's application of the Supreme Court's holding in *Burrage* and reject Carpenter's argument that he cannot be convicted of involuntary manslaughter or corrupting another with drugs. First, the [United States] Supreme Court's interpretation of a federal statute is not binding on this court's interpretation of Ohio statutes; rather, those interpretations are merely persuasive authority in interpreting similar Ohio statutes. *See State v. Phillips*, 27 Ohio St.2d 294, 298, 272 N.E.2d 347 (1971); *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, ¶ 31, 84 N.E.3d 981. We are unpersuaded that the Supreme Court's holding in *Burrage* is applicable to this case. Not only is the federal statute at issue in *Burrage* different from Ohio's corrupting-another-with-drugs and involuntary-manslaughter statutes, but Ohio law defines causation differently than causation is defined in *Burrage*. * * *
>
> Foremost, the statute at issue in *Burrage* involved a sentencing-enhancement statute. * * * *See Kosto* at ¶ 24 (acknowledging "that in *Burrage*, the United States Supreme Court was interpreting a penalty enhancement provision in a federal statute, not an Ohio criminal statute"). Unlike the sentencing-enhancement statute at issue in *Burrage*, our analysis is focused on the elements of the crimes of involuntary manslaughter and corrupting another with drugs. The elements of those crimes require a certain result — that is, causing death or serious physical harm. * * *
>
> Next, it is well established that Ohio law generally defines "cause" in criminal cases identically to the definition of "proximate cause" in civil cases. * * * *See State v. Jacobs*, 8th Dist. Cuyahoga No. 51693, 1987 Ohio App. LEXIS 6828, 1987 WL 10047, *2 (Apr. 23, 1987) ("It is merely a matter of semantics that criminal cases are 'cause' and 'result' and civil cases use 'proximate cause' and 'proximate result.' They mean the same thing. In fact, R.C. 2903.04 (Involuntary Manslaughter) uses 'proximate result' to state the offenses.")[.] * * *
>
> We conclude that the Fifth District's decision in *Kosto* fails to address the standard of causation applied to crimes in Ohio. That is, the Fifth District failed to consider whether the heroin that *Kosto* provided the victim was a substantial or contributing factor to the victim's death or serious physical harm and whether the resulting harm was foreseeable.

*Id.* at ¶ 49-54. The Third District concluded "that an overdose death is a foreseeable consequence of selling substances containing fentanyl and a rational trier of fact could have found that Yarris's death was the proximate result of Carpenter selling Yarris the compound containing fentanyl[.]" Thus, the court held that the defendant's convictions were supported by sufficient evidence. *Id.* at ¶ 63-64.

{¶42} We agree with the Third District's analysis of *Burrage* and find that the trial court did not err in failing to give Price's requested instruction for causation. In its instructions to the jury, the trial court stated that "[c]ause is an act or failure to act which in a natural and continuous sequence directly produces the death of a person, and without which, it would not have occurred." Moreover, the trial court instructed the jury that "[c]onduct is the cause of a result if it is an event, *but for* which the result in question would not have occurred." (Emphasis added.)

{¶43} We find no abuse of discretion with those instructions. In fact, it appears that the trial court's instructions set forth a "but-for" test that Price sought. Further, the record reveals that the trial court's instructions, taken in their entirety, fairly and correctly state the law applicable to the evidence presented at trial. Accordingly, we overrule Price's fifth assignment of error.

{¶44} We sua sponte find that our holding relative to Price's fifth assignment of error concerning the *Burrage* instruction is in conflict with the Fifth District's holding in *Kosto*, 5th Dist. Licking No. 17CA54, 2018-Ohio-1925. As a result, we, sua sponte, certify a conflict between the analysis in our decision and *Kosto* on the application of the

*Burrage* instruction and causation for the Ohio Supreme Court's resolution.

**B. Sufficiency of the Evidence**

**{¶45}** In his first assignment of error, Price argues that the trial court erred in denying his Crim.R. 29 motion for the charges of corrupting another with drugs and tampering because there was insufficient evidence for the elements of those crimes.

**{¶46}** Crim.R. 29(A) provides for an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed. 652 (1982). When reviewing a sufficiency of the evidence claim, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

### 1. Corrupting Another with Drugs

**{¶47}** To establish that Price was guilty of corrupting another with drugs in violation of R.C. 2925.02(A)(3), the state had to show that Price "administer[ed] or

furnish[ed] to another or induce[d] or cause[d] another to use a controlled substance, and thereby cause[d] serious physical harm to the other person[.]"

### a. "Furnish"

**{¶48}** Price first argues that there was insufficient evidence that he knowingly "furnished" the victim with heroin and fentanyl. Specifically, he states that "he supplied the drugs to Ms. Fort not [the victim] and therefore he was not legally liable for the actions of Ms. Fort who chose to supply them to [the victim]."

**{¶49}** Foremost, the Revised Code does not define "furnish." Black's Law Dictionary, however, has defined "furnish" to mean "[t]o supply, provide, or equip, for accomplishment of a particular purpose." *Black's Law Dictionary* 466 (6th Ed.1991).

**{¶50}** The Eleventh District rejected a similar argument in *State v. Patterson*, 11th Dist. Trumbull No. 2013-T-0062, 2015-Ohio-4423. In that case, witnesses testified that the defendant showed up and sold drugs to a third party, who then gave the drugs to the victim. The third party testified that he called the defendant and told the defendant when he arrived that the victim was paying for the heroin. After being convicted of corrupting another with drugs, the defendant appealed, arguing that "there was insufficient evidence that he 'administer[ed] or furnish[ed]' a controlled substance to [the victim], since the evidence only demonstrated that the drug transaction occurred between [the defendant] and [a third party]." *Id.* at ¶ 85. The court disagreed, stating that it did "not matter if the heroin was sold or delivered directly to [the third party], provided that the sale gave [the victim] access to it. * * * [The victim] gave the money to [the third party] who gave

it to [the defendant]." *Id.* at ¶ 86. Based on the third party's testimony that he told the defendant that the victim was purchasing the heroin, the court found that the defendant "knew he was giving [the victim] access to heroin by the sale to or through [the third party]." *Id.* As a result, the court found sufficient evidence to show that the defendant "furnished" the victim with heroin and affirmed his conviction. *Id.*; *see also State v. Potee*, 12th Dist. Clermont No. CA2016-06-045, 2017-Ohio-2926, ¶ 31 ("Joslin's testimony regarding each stage of the transaction coupled with text messages and call logs between Adkins and appellant on the day of the transaction provided evidence for the jury to conclude appellant was aware his conduct would probably result in the sale of heroin or fentanyl."); *State v. Jones*, 5th Dist. Licking No. 05 CA 59, 2006-Ohio-916, ¶ 46 (affirming the defendant's conviction for corrupting another with drugs because "evidence was adduced that appellant purchased the heroin with the understanding that Loring would share it with both appellant and appellant's father.").

{¶51} We reach the same conclusion in this case. The state presented sufficient evidence that showed Price knew he was giving the victim access to heroin and fentanyl by selling it to Fort. Text messages between Fort and Price show that Fort told Price that she had "people waiting" to purchase the drugs from her once she received them from Price and that she was using Price to obtain drugs for people other than herself. Fort even testified that she told Price that the drugs were for someone else. She also testified that the victim and Price were in her apartment at the same time and even acknowledged each other when the victim purchased the drugs from Fort. Like

*Patterson*, this evidence is sufficient to show that Price knowingly gave the victim access to heroin and fentanyl "by the sale to or through" Fort and, therefore, furnished the victim with heroin and fentanyl.

### b. Serious Physical Harm

{¶52} Price next argues that there was insufficient evidence that either the heroin or fentanyl caused the victim "serious physical harm." R.C. 2901.01(A)(5) defines "serious physical harm" as

(a) [a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) [a]ny physical harm that carries a substantial risk of death;

(c) [a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) [a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶53} First, we find there was sufficient evidence that the victim suffered serious physical harm from fentanyl. The state's expert, Dr. Felo, testified that the victim died "as a result of acute intoxication by the combined effects of escitalopram, fentanyl, and mirtazapine[,]" and that the fentanyl was the "primary cause" of death. Dr. Felo stated that the victim's abnormally heavy and dark-colored lungs confirmed his conclusions. This testimony was sufficient to establish that the fentanyl caused the victim serious physical harm under R.C. 2901.01(A)(5)(b).

**{¶54}** We also find there was sufficient evidence that the heroin caused the victim serious physical harm. Under R.C. 2901.01(A)(5)(b), "[a]ny physical harm that carries a substantial risk of death" constitutes serious physical harm. We have previously held that heroin is a "serious and deadly drug that causes physical harm every time it is administered." *State v. Cunningham*, 8th Dist. Cuyahoga No. 106109, 2018-Ohio-4022, ¶ 15. It is also beyond question that heroin is a drug that carries a substantial risk of overdose and death. Here, the heroin that Price furnished and the victim ingested caused physical harm to the victim that carried a substantial risk of death. Therefore, we find sufficient evidence that heroin caused serious physical harm to the victim.

**{¶55}** Price also argues that other evidence suggests that the victim did not die from the drugs Price furnished, that the state failed to investigate whether the victim died from "a second source of drugs[,]" and that Dr. Belloto's testimony negated Dr. Felo's testimony that fentanyl caused the victim's death. Price's arguments concerning other evidence goes to the weight of the evidence, however, and does not undermine our conclusion that Dr. Felo's and Peters's testimony was sufficient to establish that fentanyl and heroin caused the victim serious physical harm.

### c. Proximate Cause

**{¶56}** Finally, Price argues that there was insufficient evidence that "he furnished the drugs that were the proximate cause of [the victim's] serious physical harm." He states that because the two antidepressants were "designated in [Dr. Felo's] diagnosis, [the victim's] voluntary consumption of the [fentanyl] interfered in the proximate cause

of his death." He also argues that "the [s]tate failed to establish what role the anti-[depressant] medication[s] played in the cause of death." His argument relies on the United States Supreme Court's recent decision in *Burrage*. However, we already found that the trial court did not err in failing to give or apply Price's requested instruction for causation set forth in *Burrage* and that the trial court's but-for instruction was proper as to proximate cause.

{¶57} Further, there was sufficient evidence presented of proximate cause. At trial, Dr. Felo testified that the victim died "as a result of acute intoxication by the combined effects of escitalopram, fentanyl, and mirtazapine[,]" and that the fentanyl was the "primary cause" of death. While he acknowledged that the two antidepressants found in the victim "played a very small role" in the respiratory depression that the victim experienced, Dr. Felo also testified that absent those medications, his determination of death — acute intoxication by fentanyl — would have remained the same. Therefore, contrary to Price's argument, the state presented testimony that the antidepressants played a "very small role" in the victim's death. Because the fentanyl and heroin were mixed together and that mixture constitutes a "controlled substance" under R.C. 2925.02(A)(3), we find that Dr. Felo's testimony was sufficient to satisfy the causation element of R.C. 2925.03(A)(3) for both fentanyl and heroin.

{¶58} Additionally, Price argues that "the issue of causation was further muddled by the possibility that [the victim] used the drugs to commit suicide which was an argument the [d]efense was prevented from making to the jury." However, Price's

"muddled" argument goes to the weight of the evidence and has no bearing on the sufficiency of the evidence presented by the state concerning proximate cause.

{¶59} In summary, we find that the state presented sufficient evidence to support Price's convictions for corrupting another with drugs.

### 2. Tampering

{¶60} Price also argues that there was insufficient evidence to support his conviction for tampering with evidence.

{¶61} To establish that Price was guilty of tampering with evidence in violation of R.C. 2921.12, the state had to show that Price (1) knew that an official proceeding or investigation was in progress or was about to be or likely to be instituted, and (2) altered, destroyed, concealed, or removed evidence (3) with purpose to impair its value or availability as evidence in such proceeding or investigation. *State v. Shaw*, 2018-Ohio-403, 105 N.E.3d 569, ¶ 16 (8th Dist.).

{¶62} Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. Indeed, "'direct evidence of fact is not required[;] circumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶63} In this case, the charge for tampering with evidence arose on August 4,

2016, two days after the victim's death. That day, police arranged a "point out" between Fort and Price at a local bus station. According to Detective Leanza, the police had Fort text Price to set up the deal, and officers stationed themselves in unmarked vehicles before Price's arrival.

{¶64} Detective Leanza testified that after arresting Price in the parking lot, "his mouth had kind of drooped open and there was a baggie sticking out of his mouth. So [paramedics] removed the baggie. I put on a pair of gloves. And then they handed me the baggie and we placed it into an evidence bag. Inside the bag was a mixture — was a pinkish-tan mixture with saliva." The following exchange also occurred during the detective's testimony:

Q. And you had indicated that there was a bag in Mr. Price's mouth?

A. Yes.

* * *

Q. You thought that possibly he had swallowed a bag of drugs, didn't you?

A. Yes.

Q. Okay. And in your experience, that might be something that someone would do, if they were trying to conceal drugs, they would ingest the bag of drugs?

A. Depending on the size.

* * *

Q.    So [do] you think it's impossible that [Price] was using any of the drugs [found in Jacob's car]?    He just fell out for no reason?

A.    Because of the drugs that were in his mouth.

Q.    And when people use drugs, have you known them, in your experience, to suck on the bags to try to get all of the drugs out of the bag?

A.    * * * I've seen that happen.

Q.    Yeah?    And you didn't find any additional drugs on Mr. Price?

A.    No.

Q.    Just a bag that was tested with some residue?

A.    Yes.

* * *

Q.    If he wanted to get rid of any evidence, he could have swallowed that bag was in his mouth?

A.    I can't tell you if he could have or not.  I don't know.  I'm not him.

Detective Leanza stated that the bag had only a trace amount of drugs.

{¶65} On redirect, the following exchange between Detective Leanza and the state occurred as to the controlled buy at the RTA station:

Q.    Have you experienced people in the course of an arrest attempt to conceal evidence inside their mouth?

A.    I have witnessed it happen, yes.

Q.    Is that consistent with you finding the bag in Mr. Price's mouth?

A. Yes. Although I didn't witness it, him put it in his mouth[.]

\* \* \*

Q. [W]as there also enough time that [Price] could have just put [the baggie] in his mouth once he heard the identification of police?

A. Yes. Because unfortunately, as I was coming up from the rear, I couldn't see his face or what was transpiring in front of him, and this is a parking lot, so its angled parking and Mr. Jacob had pulled into a spot, and then there [were] other cars next to him, so unfortunately our view into the car — immediate view into the car was not there.

{¶66} We find that there was sufficient, circumstantial evidence to show that Price ingested the drugs that were in the baggie when he saw the police. Police organized a drug sale between Fort and Price, and Fort requested the same drugs that Price provided to the victim. Detective Leanza testified that when they arrested Price, they did not find any drugs on him and only found a baggie that had a trace amount of a "pinkish-tan substance" that resembled what they found in the victim's apartment. Detective Leanza stated that Price would have had enough time to place the baggie in his mouth and swallow the baggie's contents before police were able to get to the passenger side of the vehicle and detain him. Further, Price overdosed within minutes of his arrest. The detective's testimony and evidence collected from Price provides sufficient circumstantial evidence that Price swallowed the drugs meant for Fort upon learning of police's presence. Therefore, we find that there was sufficient evidence that Price (1) knew that an official proceeding or investigation was in progress or was about to be or likely to be instituted, and (2) altered, destroyed, concealed, or removed evidence (3) with purpose to impair its value or availability as evidence in such proceeding or investigation.

**{¶67}**     Accordingly, we overrule Price's first assignment of error.

**C. Manifest Weight of the Evidence**

**{¶68}** In his second assignment of error, Price argues that his convictions for corrupting another with drugs and tampering were against the manifest weight of the evidence.     As part of his assignment of error, Price "incorporates all arguments detailed in the first assignment of error[.]" As to the weight of the evidence, Price argues that there was other evidence suggesting that the victim died from "a second source of drugs[,]" that Dr. Belloto's testimony was more credible than Dr. Felo's testimony, and that "the issue of causation was further muddled by the possibility that [the victim] used the drugs to commit suicide which was an argument the defense was prevented from making to the jury."

**{¶69}** A challenge to the manifest weight of the evidence tests whether the prosecution has met its burden of persuasion.  *Thompkins*, 78 Ohio St.3d at 390, 678 N.E.2d 541.   On review from a manifest weight challenge, the appellate court is tasked with reviewing all of the evidence in the record and in resolving the conflicts therein, determining whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."   *Id.* at 387.   "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."   *Id.*  Moreover, this court recognizes that the "weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact[.]" *State v. Peterson*, 8th

Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 73, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶70} First, many of Price's arguments concerning manifest weight — particularly those challenging his tampering conviction and whether he "furnished" drugs and caused "serious physical harm to" the victim — were raised in his assignment of error contesting the sufficiency of the evidence. We rejected those arguments, and we will not repeat our analysis here.

{¶71} In addition to the arguments he raised under sufficiency, Price points to Dr. Belloto's testimony and argues that Dr. Felo's testimony was less credible. He also argues that there was a "possibility that [the victim] sought drugs from another source which would account for the [$120 of] missing money that [the victim] had withdrawn from his bank at 1:00 a.m. the night he purchased drugs from Ms. Fort[.]" We disagree again.

{¶72} Price contends that "Professor Belloto testified that the likely cause of death was [the victim's] heart condition." Price further maintains that "Dr. Felo did not possess the same level [of] expertise in toxicology and pharmacology as Professor Belloto." "Professor Belloto" was certified as an expert in pharmacology and toxicology. He held a Ph.D., a doctor of philosophy, in clinical pharmacology. "Professor Belloto" testified that he does not currently hold any additional certifications, had never performed an autopsy, and had never determined the cause of someone's death. Dr. Felo, on the other hand, was an M.D., a medical doctor, board certified in anatomic,

clinical, and forensic pathology. He had worked at the medical examiner's office for over 20 years and had performed over 3,500 autopsies. Most importantly, Dr. Felo had performed the autopsy of the victim in this case. The jury heard the testimony of both Dr. Felo and "Professor Belloto" and found Dr. Felo to be more credible. Therefore, we will not disturb the jury's credibility determination on appeal in this case.

{¶73} As to the argument that the victim died from a separate source of drugs, Price's trial counsel raised that same issue during trial and during his closing argument. The jury heard evidence concerning the difference between the amount the victim withdrew from the ATM and the amount he paid Fort and convicted Price regardless.

{¶74} Finally, Price argues that his convictions for corrupting another with drugs were against the manifest weight of the evidence because there was evidence that the victim was suicidal and that evidence "muddled" the issue of causation. However, the jury heard evidence showing that the victim was suicidal, but nonetheless convicted Price. As a result, we will not undermine the jury's determination of that evidence in this case.

{¶75} After reviewing the evidence in this case, we find that this is not the "exceptional case in which the evidence weighs heavily against the conviction" and, therefore, that Price's convictions are not against the manifest weight of the evidence.

{¶76} Accordingly, we overrule Price's second assignment of error.

**D. Merger**

{¶77} In his third assignment of error, Price argues that the trial court erred when it failed to merge Price's convictions for corrupting another with fentanyl and heroin, because "they were committed with the same animus, similar import, occurred on the same date and during the same encounter with no separation in time or location."

{¶78} When determining whether two offenses are allied offenses of similar import, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶79} Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

{¶80} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. In *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be convicted of all of the offenses if any one of the following is true: "(1) the conduct constitutes offenses of

dissimilar import or significance, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation." *Id.* at paragraph three of the syllabus, citing R.C. 2941.25(B).

{¶81} "Two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at paragraph two of the syllabus. "[O]ffenses are not allied offenses of similar import if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21.

{¶82} Here, there was a single course of conduct underlying Price's convictions for corrupting another with drugs — he furnished the victim with a single bag containing a mixture of heroin and fentanyl. Price did not furnish the victim with the drugs in separate actions or sales or even heroin in one bag and fentanyl in another; instead, the drugs were mixed together in one bag and furnished at the exact same time. Further, the harm resulting from Price's conduct, the victim's death, was the same and indistinguishable. Finally, the record establishes that Price did not commit the offenses separately or with separate animuses or motivations. Therefore, under *Ruff*, Price's convictions for corrupting another with drugs are allied offenses of similar import and should have merged for purposes of sentencing. Accordingly, we sustain Price's third assignment of error.

### E. Consecutive Sentences

{¶83} In his fourth assignment of error, Price argues that the record did not support

the trial court's imposition of consecutive sentences. Based on our resolution of Price's third assignment of error, however, his argument concerning consecutive sentences is now moot.

### F. Exculpatory Evidence

{¶84} In his sixth assignment of error, Price argues that the trial court deprived him of his right to a fair trial and due process when it denied his request to present the victim's medical records at trial, which he argues were exculpatory because they showed that the victim was suicidal and "offered an alternative explanation that [the victim] intended to overdose on his anti-psychotic medication and heroin and that it was his express intent to kill himself." He maintains that "if the jury would have been allowed to hear that only a week before, [the victim] had planned to commit suicide in the exact manner that he did, the jury could have determined that [the victim's] decision to use the drugs in this manner was an independent intervening cause of his death." Price also takes issue with the state's failure to supply him with a copy of the medical records, arguing that "since the records were not provided by the [s]tate, the [d]efense was unable to impeach Dr. Felo with his conclusion of accidental death."

{¶85} "[P]rosecutorial violations of Crim.R. 16 result in reversible error only when there is a showing that (1) the prosecution's failure to disclose was willful, (2) disclosure of the information prior to trial would have aided the accused's defense, and (3) the accused suffered prejudice." *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 131, citing *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689

(1983). "Crim.R. 16 requires the State to provide copies of items related to discovery for the defense. This rule applies to items obtained by or belonging to the State. The rule does not require the State to obtain items requested by the defense that the State does not already possess." *State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 51.

{¶86} We find that analyzing the three factors set forth in *Jackson* is unnecessary because there is no evidence in this case that the state ever possessed or withheld the victim's medical records from the defense. In fact, the state explained to Price's trial counsel and the court that while Dr. Felo received [the victim's] ORAS "as part of his investigation as medical examiner," it did not have possession of that report and it "[was not] part of [its] case file for the detective." The state also informed the court that it did not have the victim's medical records. Further, Price's trial counsel stated that the hospital that had the victim's records failed to respond to his subpoena and requests and the trial court's order. Upon learning of the hospital's failure to respond, the trial court stated that it would contact the hospital itself. Therefore, because the record shows that the medical records were not in the state's possession, we find no Crim.R. 16 violation. *See Primeau* at ¶ 52 (finding no Crim.R. 16 violation because "Primeau has failed to show that the records were within the State's possession, custody, or control, and that the State withheld them from the defense").

{¶87} As to Price's argument that the trial court should have admitted the medical records, we review the trial court's decision regarding the exclusion of those records for

an abuse of discretion. *State v. Pruitt*, 8th Dist. Cuyahoga No. 98080, 2012-Ohio-5418. Under Evid.R. 401, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Further, under Evid.R. 403(A), "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶88} In the lower court proceedings, Price's counsel argued that the medical records showed that the victim had gone "to the hospital and said that he was going to get heroin from his neighbor to kill himself" the week before his overdose. He argued that the records showed an "independent, intentional, intervening act [by the victim] that would break the chain of causation." In response, the state argued that admitting the records and allowing Price to introduce a "suicide theory" would "confuse the jury and allow them to consider things that are not a defense" to the charges against Price. The trial court agreed with the state, finding that the alleged "intervening act * * * [did] not negate the criminal act and * * * will confuse the jury and [did not present a] defense to the involuntary manslaughter charge."

{¶89} We find that the trial court did not abuse its discretion because while the records may very well have shown that the victim was suicidal and attempted suicide by overdose recently, that evidence would not change the basic fact that the victim took the drugs furnished by Price and died as a result. Nor do the records undermine Dr. Felo's

testimony that the victim died as the result of the drugs found in his system. By furnishing the victim with drugs, Price knew that there was a chance that the victim would overdose, and the victim's suicidal attempt the week prior was not a fact of consequent to the charges against Price. *See State v. Johnson*, 56 Ohio St.2d 35, 39, 381 N.E.2d 637 (1978) ("It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts.").

{¶90} We disagree with Price's argument that he could have challenged Dr. Felo's conclusion that the victim's death was accidental. Challenging Dr. Felo's conclusion would not undermine the evidence showing that Price furnished drugs to the victim, who overdosed and died as a result. Further, the medical records would not have any effect on determining Price's criminal responsibility because the records do not change his voluntary acts.

{¶91} Accordingly, we overrule Price's sixth assignment of error.

{¶92} Judgment affirmed in part and reversed in part. Case is remanded for the trial court to merge Price's convictions for corrupting another with drugs and allow the state to elect which of the convictions it wishes to pursue at sentencing. We also sua sponte certify a conflict between the analysis in our decision concerning Price's fifth assignment of error and *Kosto* on the application of the *Burrage* instruction and causation for the Ohio Supreme Court's resolution.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY J. BOYLE, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR